No. 25-7126

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

TREVOR KEVIN BAYLIS,

Plaintiff - Appellant,

v.

VALVE CORPORATION,

Defendants - Appellees.

_____

On Appeal from the United States District Court
for the Western District of Washington

_____

BRIEF OF APPELLANT

_____

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560
Tampere
FINLAND
+358 41 722 5899

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES ........................................................... 3

STATEMENT REFERENCING ADDENDUM ...................................... 4

STATEMENT OF THE CASE AND FACTS ......................................... 4

SUMMARY OF THE ARGUMENT ................................................... 10

STANDARD OF REVIEW ................................................................ 12

ARGUMENT .................................................................................... 15

    I.    BAYLIS PRESENTED EVIDENCE TO THE LOWER COURT
        FROM WHICH A FACT FINDER COULD FIND HIM
        THE COPYRIGHT OWNER AND AUTHOR.    15

        A.    Baylis is Genuinely Joint Author of the Work.    15

        B.    Authorship Analysis Performed in Preparation
            for the U. S. Copyright Office Registration.    19

            1.    U. S. Copyright Office Registration.    22

            2.    Response of the Register of Copyrights to
               the Investigation Request.    23

    II.    THE LOWER COURT CONFLATES COMITY WITH
        CHOICE - OF - LAW ANALYSIS AND RELIES
        ON A RULING LACKING JURISDICTION.    26

        A.    The Lower Court's Ruling Relies Upon a Foreign
            Ruling Lacking Subject Matter Jurisdiction,
            and Void *Ab Initio*.    26

            1.    Three Previous Foreign Cases.    26

       2.      The Evidence Is Sufficient for a Fact Finder to Agree with Baylis on the Fact of First Country of Publication That Invalidates the Second Finnish Ruling and Renders It Unfit for Comity.    34

   B.   Choice-Of-Law Analysis, Not Comity, Establishes Which Country's Laws Apply to Determine Who is Author of a Work.    36

   C.   Comity Does Not Compensate for Lack of Jurisdiction to Determine Who is Author of a Work.    37

III.   THE LOWER COURT'S REFUSAL TO RECOGNIZE COPYRIGHT AUTHORSHIP AND OWNERSHIP LEADS TO A TACIT IMPROPER "ORPHAN WORK DEFENSE."    39

   A.   The Lower Court Ruling Would Allow Unauthorized Copying and Distribution of Works Deemed "Orphaned Works."    39

   B.   The Lower Court's Ruling does Nothing to Solve the Problem in this Case.    41

CONCLUSION ................................................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

*Aalmuhammed v. Lee,*

202 F.3d 1227(9th Cir. 2000) ............................................................ 17

*AMA Multimedia, LLC v. Wanat,*

970 F.3d 1201, (9th Cir. 2020) ......................................................... 13

*Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242 (1986) ................................................................... 12, 24

*Arbaugh v. Y & H Corp.,*

546 U.S. 500 (2006) ........................................................................ 31

*Asvesta v. Petroutsas,*

580 F.3d 1000 (9th Cir. 2009) ......................................................... 14

*Atwood v. Fort Peck Tribal Court Assiniboine,*

513 F.3d 943, 946 (9th Cir. 2008) ................................................... 13

*Colchester v. Lazaro,*

16 F.4th 712 (9th Cir. 2021) ............................................................ 14

*Community for Creative Non-Violence v. Reid,*

490 U.S. 730 (1989) ................................................................... 5, 37

*Cong v. Zhao* No. 2:21-cv-01703,

2024 WL 3091187 (W.D. Wash. June 21, 2024) ...............................36

*Cooper v. Tokyo Electric Power Co. Holdings, Inc.,*

960 F.3d 549 (9th Cir. 2020) ...........................................................13

*Del Madera Props. v. Rhodes & Gardner, Inc.,*

820 F.2d 973, 980 (9th Cir. 1987) ...............................................5, 37

*Diorinou v. Mezitis,*

    237 F.3d 133 (2d Cir.2001) ............................................................ 14

*DRK Photo v. McGraw-Hill Global Education Holdings, LLC,*

    (9th Cir. 2017) ..................................................................... 34

*Feist Publications v. Rural Telephone Services, Co.,*

    499 U.S. 340 (1991) ................................................................. 18, 25

*Foad Consulting Group, Inc. v. Azzalino,*

    270 F.3d 821 (9th Cir. 2001) .......................................................... 15

*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC,*

    586 U.S. 296 (2019) ................................................................. 36

*Fresno Motors, LLC v. Mercedes Benz USA, LLC,*

    771 F.3d 1119 (9th Cir. 2014) ......................................................... 12

*Garcia v. Service Employees. International Union,*

    993 F.3d 757 (9th Cir. 2021) .......................................................... 13

*Gingery v. City of Glendale,*

    831 F.3d 1222 (9th Cir. 2016) ......................................................... 13

*Glass Egg Digital Media v. Gameloft, Inc., No.17 - cv - 04165, 2018*

    WL 3659259 (N.D. Cal. Aug 2, 2018) ................................................. 18

*Google LLC v. Oracle America., Inc.,*

    593 U.S. 141 S. Ct. 1183, 1196 (2021) ................................................. 27

*Government Employees Ins. Co. v. Dizol,*

    133 F.3d 1220 (9th Cir. 1998) ......................................................... 14

*Hilton v. Guyot,*

    59 U.S. 113,16 S. Ct. 139 (1895) ................................................... 11, 36

*Hunt v. Cromartie,*

    526 U.S. 541 (1999) ........................................................................ 12

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*

    153 F.3d 82 (2d Cir. 1998) ...............................................11, 14, 15, 37

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*

    475 U.S. 574 (1986) .......................................................................7,12

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.,*

    795 F.3d 997(9th Cir. 2015) ............................................................33

*Paulsen v. CNF Inc.,*

    559 F.3d 1061 (9th Cir. 2009) .........................................................13

*Phantomalert, Inc. v. Google Inc., No.15-cv-03986,*

    2016 WL 879758 (N.D. Cal. Mar. 8, 2016).......................................18

*Pony Express Records, Inc. v. Springsteen,*

    163 F. Supp. 2d 465, 476 (D.N.J. 2001) ...........................................38

*San Remo Hotel, L.P. v. San Francisco City & County,*

    364 F.3d 1088 (9th Cir. 2004) .........................................................15

*Sarver v. Chartier,*

    813 F.3d 891 (9th Cir. 2016) ...........................................................13

*Schnabel v. Lui,*

    302 F.3d 1023 (9th Cir. 2002) .........................................................13

*Securities & Exchange. Commission v. Stein,*

    906 F.3d 823 (9th Cir. 2018) ...........................................................15

*S.O.S., Inc. v. Payday, Inc.,*

    886 F.2d 1081 (9th Cir. 1989) .................................................5, 37, 41

*Stromberg v. Qualcomm Inc.,*

    14 F.4th 1059 (9th Cir. 2021) .......................................................... 13

*Ting v. United States,*

    927 F.2d 1504 (9th Cir. 1991) .................................... 12, 13, 16, 41, 46

*Traxler v. Multnomah County,*

    *596 F.3d 1007 (9th Cir. 2010)* ........................................................ 14

*United States v. Gordon,*

    37 F.4th 767 (1st Cir. 2022)............................................................. 39

*X Corp. v. Bright Data Ltd.,*

    733 F. Supp. 3d 832 (N.D.Cal. 2024)............................................... 33

*Zinser v. Accufix Research Institute., Inc.,* 253 F.3d 1180

    (9th Cir.), amended by 273 F.3d 1266 (9th Cir. 2001) ..................... 13

**Constitutional Provisions and Statutes**

17 U.S.C. § 101 ...............................................................................3, 17

17 U.S.C. § 102 ....................................................................................21

17 U.S.C. § 102(b)...........................................................................22, 27

17 U.S.C. § 102(6) ...............................................................................21

17 U.S.C. § 104(b)(2) ...........................................................................37

17 U.S.C. § 106 .....................................................................................3

17 U.S.C. § 201(a) ...........................................................................5, 37

17 U.S.C. § 411(a)................................................................................36

17 U.S.C. § 411(b)(2)......................................................................22, 23

17 U.S.C. § 501 .....................................................................................3

17 U.S.C. § 512 .....................................................................................3

28 U.S.C. § 1291 ................................................................... 3

28 U.S.C. § 1338 ................................................................... 3

28 U.S.C. § 2107 ................................................................... 3

U.S. Constitution Fifth Amendment ............................................. x

**Rules**

Federal Rules of Civil Procedure Rule 56(a)............................... 12

Federal Rules of Appellate Procedure Rule 4(a) ......................... 3

Ninth Circuit Rules Circuit Advisory Committee Notes

(1 December 2024) ................................................................... x

Ninth Circuit's Local Rule 30-1.3 ............................................. 2

**Other Authorities**

*Baylis v Troll VFX*: L 15/3246821

21. Oct. 2016 ........................... 1, 3, 4, 9, 10, 18, 19, 20, 23, 26, 28, 29

Berne Convention Implementation Act 1988 ............................. 36

Berne Convention for the Protection of Literary and Artistic Works

(Paris Act, 1971) ............................................ 4, 14, 19, 30, 36, 38

*id* Article 5 ........................................................................... 3

*id* Article 5(2) ................................................................... 19

*id* Article 5(4)(a) ........................................................... 32, 38

*id* Article 6bis ................................... 5, 19, 20, 25, 36, 37, 38

*id* Article 15 ..................................................................... 19

Article 1 of Protocol 1 to the European Convention on Human Rights

(In, *Safarov v. Azerbaijan*) ................................................. 39

(Art. 27(2), at 76, Universal Declaration of Human Rights

(Dec. 10, 1948) .............................................................. x

Copyright, Designs and Patents Act 1988 (CDPA) ..................................... 31

German Act On Copyright And Related Rights

      (Urheberrechtsgesetz – UrhG translation by Ute Reusch) ................. x

Guide To The Berne Convention for the Protection of Literary

and Artistic Works (Paris Act, 1971) (https://www.wipo.int/edocs/pubdocs/

en/copyright/615/wipo_pub_615.pdf) ......................................... 31

Finnish Copyright Act §63(2) ......................................... 7, 32, 34

Infopaq C-5/08 ............................................................. 17

MAO:302/18: *A, B, C, D and E v Blind Spot Pictures Oy and*

      *Iron Sky Universe Oy*: 2017/588. 31. May. 2018

      (Also, "second ruling")........... 1, 3, 7, 8, 11, 26, 29, 39, 31, 32, 34, 35,

MAO:302/18 - Counterclaim: *Blind Spot Pictures Oy and Iron*

      *Sky Universe Oy v A, B, C, D and E*:

2017/701. 31. May. 2018. ................................................... 26, 32

Response Of The Register Of Copyrights To Request

Pursuant To 17 U.S.C. § 411(b)(2) ........................................... 23

Restatement (Fourth) Foreign Relations Law § 483 (2018) ...................... 12

*Safarov v. Azerbaijan* 885/12 Judgment 1.9.2022

      [Section V] (European Court Of Human Rights) .............................. 39

U.S. Copyright Office Compendium

      Chapter 2000; 2003.2(B) ................................................. 37

United States Copyright Office Registration No. PA0002432422 ............... 4

## INTRODUCTION

This is a copyright case. Appellant Trevor Kevin Baylis ("Baylis") is a high level 3D animation specialist, a United Kingdom national residing in Finland, and has been confirmed as the author the work at issue by a Finnish court in *Baylis v Troll VFX*: L 15/3246821 - 21. Oct. 2016, and also by the United States Copyright Office. Baylis has not transferred his full copyrights by assignment to any other party by written conveyance.

This case hinges on one question. Does Appellee have a valid license to display and distribute Baylis copyrighted work? The answer to that is <u>no</u>.

In short, it is clear on the record that (1) Baylis presented substantial evidence to the lower court on which a reasonable factfinder could find by the preponderance of evidence that Baylis is the copyright owner and author; (2) the lower court erred in granting, Appellee's Motion for Summary Judgment by conflating "comity" with the proper "choice-of-law analysis"; (3) the lower court erred by relying on a "second ruling" in Finland coming after *Baylis v Troll VFX*, a ruling that lacked subject matter jurisdiction and is a legal nullity void *ab initio;* (4) the lower court's ruling effectively allows Appellee to invoke a tacit "orphan works defense" not found in the law that would prevent legitimate infringement liabilities from being litigated; (5) nothing has been properly resolved by the lower court whilst Appellee continues on with infringing activities without any license from Baylis.

Appellee Valve Corporation ("Valve") is a video game distributor in Bellevue, Washington that operates a digital storefront and gaming platform called "Steam." On information and belief, Valve willfully continues to sell,

display, and distribute video games and images derived from Baylis' copyrighted Work. Baylis sent a take-down request to Valve Customer Support on August 7, 2023 but Valve has failed in its duty to expeditiously disable the infringing material under the Digital Millennium Copyright Act, 17 U.S.C. § 512.

In the Action below, Valve Corporation ("Valve")  moved for summary judgment under principles of comity and collateral estoppel, see Designation of Record[1] ("DR") 76. Valve wrongly contend that Baylis "cannot establish any copyright ownership in his Work." (DR 76 at 1: 18-21.) The lower court granted summary judgment (DR 98) ("Order") based on Valve's misleading conclusory assertion, contrary to evidence in the record that,  "[Baylis] cannot establish copyright ownership in *Iron Sky* or its 3D models and animation because a Finnish court – in an action Baylis brought as plaintiff – has already ruled on these exact copyright ownership issues and found, after a full evidentiary hearing in which Baylis participated, that he does not own the copyrights." DR 98 at 1: 15-19. However, any reasonable factfinder can find facts under which this is simply not true. This Appeal followed.

## JURISDICTIONAL STATEMENT

The lower Court had initially subject matter jurisdiction under 28 U.S.C. § 1332 because this case is a diversity of citizenship case and the amount at stake is more than $75,000. This case also has a federal question of jurisdiction arising

---

[1]  Baylis is exempt under Rule 30-1.3 to file excerpts of record. ("DR") Designation of Record and number signifies the docket on the lower court record. Page numbers are his own. His own lower court docket sheet is filed just for practical ease of reference as an appendix.

under the Copyright Act (17 U.S.C. §§ 101, 106, 501) (17 U.S.C. §501) and the Digital Millennium Copyright Act (17 U.S.C. § 512).

This Court has jurisdiction under 28 U.S.C. § 1291 because the order (DR 98) is a final order disposing completely of Baylis' claims under (17 U.S.C. §501), and 28 U.S.C. § 1338 defines federal court power over core intellectual property disputes. Appellant's notice of appeal (DR 109) was timely filed on 10th November 2025 under 28 U.S.C. § 2107 and FRAP 4(a).

## STATEMENT OF THE ISSUES

Did the lower court err by granting summary judgment when a reasonable fact finder could find facts from the evidence in the court's record under which Baylis is the genuine author of the Work, as held by the very first previous Finnish court, *Baylis v Troll VFX*: L 15/3246821 - 21. Oct. 2016 and further clarified by a specific investigation by the Registrar of the United States Copyright Office?

Did the lower court err after being misled by Valve into conflating comity (respect for foreign laws/decisions) with choice-of-law analysis (determining which country's law applies) and into to showing deference to a mischaracterization of a second Finnish ruling ("MAO302/18") that was in any case forever a legal nullity *ab initio* due to a lack of subject matter jurisdiction?

Did the lower court err by allowing Valve to essentially create a tacit "orphan works defense" not found in the law under guise of comity and collateral estoppel and to allow them to continue infringing activities without conducting due diligence to determine its copyright status and obtain a valid license via any chain of title from the actual authors of the Work?

## STATEMENT REFERENCING ADDENDUM

Pertinent constitutional provisions, treaties, statutes, and other regulations or rules are set forth verbatim in the Addendum to this brief.

## STATEMENT OF THE CASE AND FACTS

Baylis is joint author of the amateur film *Iron Sky* ("Work"), (DR 85 at ¶ 7, Ex. B1 (entire film)), which he charitably contributed a vast amount of 3D modelling and animation works to, including virtual set designs.

He did this whilst surviving on unemployment benefits for six months without any *employment or service relationship* nor adequate payment either from the Works Finnish VFX vendor firm, a one man limited liability company set up by Samuli Torssonen called Energia Productions ("Torssonen"), nor from the Work's Swiss producer, Blind Spot Pictures Zurich ("Producer"), again a one man limited liability company set up by Tero Kaukomaa ("Kaukomaa").

By preponderance of evidence on this record, any reasonable factfinder could find that Baylis maintains copyright ownership of his Work, and had been previously confirmed as author of the Work by a competent court in Finland having jurisdiction, Pirkanmaa District Court, in *Baylis v Troll VFX*: L 15/3246, (DR 46-3, Ex. C at BAYLIS_11), and more recently by the United States Copyright Office in Registration Number PA0002432422 (see generally DR 66-1). Baylis has never been denied authorship to his Work nor denied full copyright by the operative part of any Finnish ruling. Indeed, it is not possible under the Berne Convention to deny an author unalienable authorship rights in their own work due to: "(1) Independently of the author's economic rights, and even after the transfer

of the said rights, the author shall have the right to claim authorship of the work."
Berne Convention Article 6bis.

"Authorship is a question of fact." *S.O.S., Inc.v.Payday, Inc.*, 886 F.2d 1081,
1086 (9th Cir.1989) (citing *Del Madera Props.v.Rhodes & Gardner, Inc.*, 820
F.2d 973, 980 (9th Cir.1987). Copyright in a work "vests initially in the author or
authors" of a work. 17 U.S.C. §201(a)."As a general rule, the author is the party
who actually creates the work ..." *Cmty.for Creative Non- Violence v. Reid*, 490
U.S.730, 737 (1989).

Furthermore, there are no assignments of copyright nor license of adaptation
rights from Baylis that would transfer rights to the Producer or any person. For this
reason, Baylis remains a joint author of the Work. (See DR 66-1 at 4: 2-6, 6: 3-14,
7: 8-13.) The Work was "first published" in Berlin, Germany on the 11th of February
2012 to a paying audience, and at that time was offered up to third party distributors
for world wide distribution. (DR 84 at 21: 5-12; DR 85, Exs. A1, Y, and Z (video
evidence), DR 113 at 4: 14-23; DR 113 -1, -2, -3, -4, and -7; Ex A, B, C, D, and G.)

*Iron sky* (The Work at issue) started off as an ambitious amateur film project
initially conceived of by some amateur film hobbyists once sitting in a sauna
in Finland that grew into a high quality visual effects extravaganza. The film
production was eventually spread over three main countries, Germany, Australia
and Finland, and consisted of combining live-action cinemaphotography filmed
on green-screen-sets combined with 3D computer generated virtual sets as well as
epic 3D animated space battles. It was tipped to be a European "Star Wars" type of
film with a premise of World War 2 German soldiers escaping to the dark side of

Moon with secret UFO technology, building space crafts and preparing to return to Earth as an invasion force.

After its initial release and first publication at the Berlin Film Festival in Germany of 11th February 2012, *Iron Sky* had some initial success due to the visual aspects of the 3D animated parts of the film, (DR 84 at 14: 12-13, DR 85 at ¶ 9, Ex. Q, (Video Evidence)), "[0:13] but what you haven't seen is special effects this well designed before... [0:37] I think visually it was impressive!" (Comments of Mark Kermode - BBC Film Reviewer.)

However, despite initial success, the Producer faced distribution issues due to lack of clear chain of title to the Work, also piracy, and later, legal/financial complications, which ultimately led to production company bankruptcies as a result of producer/artist disputes in Finnish courts where Producers ultimately lost.

At the center of all this brouhaha is senior 3D animation artist and modeling supervisor for the film, Baylis, who has been diligently attempting to resolve chain of title issues in order to bring life back to the *Iron Sky* franchise which would allow proper licensing of the copyrights.

Inexplicably standing in the way of Baylis' efforts to control his own Work are Valve Corporation, who are distributing an unauthorized video game adaptation (*Iron Sky Invasion*) featuring Baylis' Work (DR 25), using actual film footage from *Iron Sky* as well as abridged derivative copies of Baylis' 3D models, none of which was ever authorized by Baylis or any of the original 3D animation artists of *Iron Sky*. After Baylis asked Valve to take down these infringing items from their Steam Platform, Valve simply refused, forcing Baylis to take legal action against them.

Valve have mischaracterized the genuine outcome of the legal actions in Finland and are simply asserting that Baylis is not the copyright owner of his Work. Arriving back at their own misleading assertion by circular reasoning. That is Valve and the lower court ignore the evidence in the record and simply repeat their own assertion as their conclusion, a classic example of circular reasoning.

A reasonable factfinder could find facts under which the lower court would have to conclude, the second Finnish court lacked subject matter jurisdiction to rule adversely on any copyright authorship issues related to the Work, because the Work is not a Finnish work, and Finnish courts do not have any legal authority to invent their own subject matter jurisdiction, to give themselves authority to determine issues such as; who is or is not the author of the Work under Finnish Law because the territoriality restriction in Finland's own copyright act forbids that. See Finnish Copyright Act §63(2). (DR 79), restricting that Act's purview to "published works" that were "First Published" in Finland. It is undisputed that the Work was "First Published" in Germany, which means any ruling based on the Finnish Copyright Act against Baylis on authorship and copyright ownership issues related to the Work in Finland would lack subject matter jurisdiction and be void *ab initio*.

Therefore, considering that all facts are supposed to be presumed to be in favor of the non-moving party (Baylis) see, *Matsushita Elec. 2 Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) a reasonable factfinder could find facts by preponderance of the evidence on this record compelling the conclusion that the lower court erroneously dismissed Baylis' infringement claims after conflating comity with a choice-of-law analysis, and then applying collateral estoppel to

Valve's misleading characterization of the second Finnish courts ruling in Finland MAO302/18. That ruling does not deny Baylis full copyright to his Work but it is also itself a legal nullity from the start due to lacking subject matter jurisdiction related to the court's authority to examine copyright authorship issues outside the territorial restrictions of the Finnish Copyright Act.

Valve uses this to invoke a tacit "orphan work defense" not found in the law which simply obfuscates the first issue in a copyright dispute - proof of a valid copyright - to avoid Valve's infringement liability.

Moreover, even if an "orphan work defense" existed in the law, the Work would still be protected by copyright and Valve would still be required to do a diligent search to find the copyright owners. Any such diligent search, i.e. actually looking at genuine evidence, would reveal that *Baylis is* a joint author of the Work. We are then back to the beginning again where Valve do not have permission from Baylis for Valve to willfully continue to sell, display, and distribute video games and images derived from Baylis' copyrighted Work which Baylis is the author, and Valve cannot demonstrate any license from Baylis via any chain of title, and are thus infringing Baylis' copyright. Therefore, the lower court rushed reasoning and ruling, and simply has not solved the problem in this case.

As a small amateur production *Iron Sky* was initially set up to be produced in a way that shares hallmarks with the way social media platforms operate like Facebook and 'X' (Formerly Twitter). To facilitate this, an online platform was set up called "Wreckamovie" which extolled the culture of "community film making" by utilizing crowd sourcing via the Internet, (DR 25 at ¶¶ 37 - 43, DR 84 at 10: 10-13, DR 85 at ¶ 8, Ex. A.) "We wanted to do the film in many ways the same way

as Star Wreck [*sic*] – by having the community joining the production." (Director Timo Vuorensola ("Vuorensola").)

Baylis joined the project in late 2010 just as the actual production was starting and the first live action filming began in Germany and Australia see, (DR 25 at ¶¶ 82-87 and generally at 38 ¶ 92, see also DR 44-2 Ex. B at 16.)

Baylis was eventually the longest serving 3D artist and animator on the project due to his high level of skills and professional experience See *Baylis v Troll VFX*, (DR 49-3 at BAYLIS_26) (Kulmala, J.) "[i]t has also been undisputed that Baylis has, for his part, contributed to the implementation of scenes called Götterdämmerung, GWB-Gun, Hangar scene and Engine room scene. Therefore, it is natural that his identification information has been found in the file names."

Baylis was <u>not</u> actually in an employment relationship with the Finnish VFX vendor company, Energia Productions - Torssonen, nor the Swiss Producers, Blind Spot Pictures - Kaukomaa, nor had he transferred by written assignment any of his copyright ownership interest in the Work to any third party. This was because he deliberately wanted to hold on to the copyrights to his Work, (DR 25 at ¶¶ 39-44), especially as he was not being paid, and was hoping to build a career for the future based on his Work and future adaptations of it.

It is important to note that in a similar way to a social media platform's *Terms of Service*, whereby up-loaders grant non-exclusive "user licenses" to the social media platform, the same arrangement existed for the use of the 3D animation works supplied by Baylis and other 3D animation artists to be used in the film *Iron Sky*. That is to say, the Producer, at best and often tacitly, only acquired limited non-exclusive licenses to use the 3D animation work for "one film

only." (DR 25 at ¶¶ 36-44, 82-85.) Therefore, whilst this arrangement was useful to create such a high production quality, low budget film as *Iron Sky*, and to exploit the film via limited distribution, it genuinely meant that <u>the Producer was never actually the owner of the Work</u>.

Baylis appeals the lower court's actions and seeks reversal of the lower courts Order granting Motion For Summary Judgment (DR 98) and all other rulings contained within that Order and Judgment and/or relating thereto, see generally, Notice Of Appeal Of Trevor Kevin Baylis (DR 109.)

## SUMMARY OF THE ARGUMENT

This case hinges on one question: Does Valve have a valid license to display and distribute Baylis' Work? The answer to that question, any reasonable fact finder could find, is <u>no</u>.

Baylis presented evidence to the lower court which any reasonable fact finder could find establishes his claims of copyright ownership and authorship including evidence of how *Iron Sky* and Baylis's contribution to that Work were produced (DR 85 at ¶¶ 7, 8, 16-29, Ex. B1, A, F through, T), and a previous ruling in Finland, *Baylis v Troll VFX* that confirmed Baylis is the author of the Work at issue and even the objective evidence that Baylis' name "trev" is (still) contained thousands of times in the metadata of the 3D animation files related to the Work (DR 25 at ¶¶ 89-91; DR 44-2, Ex. B at 14; DR 85 at ¶ 27, Ex. P.)

Baylis also presented video evidence to the lower court of himself demonstrating the Work and the creative choices involved in creation of the Work (DR 85 at ¶¶ 16-29, Ex. F through, T).

Baylis also registered the Work at the United States Copyright Office and again provided supporting evidence of his authorship to the Work including metadata of his name "trev" in the files. The Copyright Office did a specific investigation, *at the request of defendant Valve,* and confirmed the Work was a copyrightable Work and that Baylis was joint author of the Work.

The Copyright Office reasoned, that foreign rulings are irrelevant to ownership for U.S. purposes, and that Baylis maintained the copyright because he had not transferred ownership of it to any third party such as by any "work for hire" agreement.

Baylis is UK national who resides in Finland and there were in fact three cases in Finland all of which concerned Baylis' authorship of the Work. The first confirmed Baylis as author to the Work after a live demonstration of the Work to the judge including demonstrating Baylis' name "trev" in the metadata of the files. It is not even disputed by Valve or the lower court that Baylis is the creator of the Work.

Valve and the lower court set aside the above evidence in the lower court's record and Valve have invoked a tacit "orphan work defense" via the principles of comity using the *Hilton factor* test, an incorrect test for this situation. Unfortunately, the lower court succumbed to Vlave's misleading characterisation of a second, and legally void *ab initio* Finnish ruling MAO302/18, that itself lacked subject matter jurisdiction and authority to rule on issues of copyright authorship concerning the Work, which was first published in Germany. Therefore, making Germany the "country of origin" of the Work, not Finland. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc*., 153 F.3d 82 (2d Cir. 1998) holding that copyright ownership is determined by the law of the country of origin.

A finding that the foreign court lacked jurisdiction over the subject matter is a reason to refuse enforcement. *See* RESTATEMENT (FOURTH) FOREIGN 6 RELATIONS LAW § 483 (2018) ("[a] court in the United States will not recognize a judgment of a court of a foreign state if … the court that rendered the judgment did not have personal or subject-matter jurisdiction.")

## STANDARD OF REVIEW

A district court's order granting summary judgment is reviewed *de novo*. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). "Summary judgment . . . is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)

The court may grant summary judgment only where there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Id*. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. at 248-49.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the nonmoving party and draws all factual inferences in the nonmoving party's favor. E.g., *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509-11 (9th Cir. 1991). It is error for a trial court to grant summary

judgment if evidence is present that a factfinder could find as supporting the nonmoving party's assertion of material facts. *See Ting*, 927 F.2d at 1510-11, 1515.

A district court's decision concerning the appropriate choice of law is reviewed *de novo*. *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021); *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 557 (9th Cir. 2020); *Sarver v. Chartier*, 813 F.3d 891, 897 n.1 (9th Cir. 2016); *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1072 (9th Cir. 2009). Underlying factual determinations (if properly made as part of fact finding) are reviewed for clear error. *See Stromberg*, 14 F.4th 1059; *Cooper*, 960 F.3d at 557; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001).

The district court's decision whether it has subject matter jurisdiction is reviewed *de novo*. *See Garcia v. Serv. Emps. Int'l Union*, 993 F.3d 757, 762 (9th Cir. 2021); *Gingery v. City of Glendale*, 831 F.3d 1222, 1226 (9th Cir. 2016); *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 946 (9th Cir. 2008); *Schnabel v. Lui*, 302 F.3d 1023, 1029 (9th Cir. 2002).

The district court's factual findings on issues of its own jurisdiction are reviewed for clear error. *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020), cert. denied, 142 S. Ct. 76 (2021);

However, in this case the lower court's implicit factual findings are not attached to determination of the lower court's own subject matter jurisdiction (which is not in dispute), but attached instead to an extension of comity.

Regarding the standard of review for an extension of comity, the Ninth Circuit has favorably cited the Second Circuit's approach, where the standard of review is determined by the context in which comity is extended or denied. *See*

*Asvesta v. Petroutsas*, 580 F.3d 1000, 1009 (9th Cir. 2009) (citing *Diorinou v. Mezitis*, 237 F.3d 133, 138-39 (2d Cir. 2001).

Under this approach, while grant of comity in order to abstain from hearing a case in favor of a foreign proceeding or in order to enforce a foreign judgment is reviewed for abuse of discretion, application of comity "*in considering whether to accept the adjudication of a foreign tribunal on a cause of action or a particular issue*" is reviewed *de novo*. *Id*. at 1009-10 (cleaned up; emphasis added) (quoting *Diorinou*, 237 F.3d at 139). Further, even were an abuse of discretion standard to be applied, "the appellate court [must] be able to ascertain how the district court exercised its discretion," and unreasoned discretionary rulings "must be remanded to the district court to record its reasoning in a manner sufficient to permit the proper application of the abuse of discretion standard on appellate review." *Colchester v. Lazaro*, 16 F.4th 712, 725-26 (9th Cir. 2021) (cleaned up; citing *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1015 (9th Cir. 2010), and *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc)).

On appeal from summary judgment, all facts and inferences underlying or related to a grant of comity should be presumed in favor of the non-movant, Appellant Baylis.

Under Berne Convention rules, the law of the jurisdiction where the copyrighted work was "First Published" sets the "point of attachment" and "country of origin" of the Work, which in this case would be Germany. Whilst the Ninth Circuit does not have exactly comparable case law to the Berne Convention rules, the issue of determining "country of origin" in addressing questions of initial ownership of a copyrighted work was addressed in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir 1998) which has been cited favorably

by the Ninth Circuit in, *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 826
(9th Cir. 2001) where there was an issue of determining whether state of federal
law applied. Therefore, *Itar-Tass* appears to be the appropriate choice for standard
of review in this case as to subject matter jurisdiction involved in the issue of
copyright authorship holding it and can be reviewed *de novo*.

"Issue preclusion...forecloses relitigation of factual or legal issues that have
been actually and necessarily decided in earlier litigation." *San Remo Hotel, L.P. v.
San Francisco City & Cty.*, 364 F.3d 1088, 1094 (9th Cir. 2004). The court reviews
"*de novo* whether issue preclusion is available." *Sec. & Exch. Comm'n v. Stein*, 906
F.3d 823, 828 (9th Cir. 2018).

## ARGUMENT

I. **BAYLIS PRESENTED EVIDENCE TO THE LOWER
COURT FROM WHICH A FACT FINDER COULD
FIND HIM THE COPYRIGHT OWNER AND AUTHOR.**

A. **Baylis is Genuinely Joint Author of the Work.**

The threshold issue of material fact is that Baylis is genuinely the author of
his own Work supported by the evidence of his creation of that Work (Generally
DR 44-2, Ex. B, DR 49-3, Ex. C at BAYLIS_11, DR 85 at ¶¶ 16-29, and, Ex. F
through, T), and lack of evidence of him ever signing over any copyright ownership
in that Work to any third party or any assignment or other device in favor of Valve
for them to commercially exploit his Work. Valve do not even dispute that Baylis is
the creator of his own Work, nor can they because of the sheer weight of evidence
in the record available to any reasonable factfinder and taken most favorably to
Baylis' claim in his appeal that he is genuinely a joint author of the Work at issue
and genuinely responsible for bring into existence numerous 3D models and

animated scenes including set designs for the film *Iron Sky*. It is error for a trial court to grant summary judgment if evidence is present that a factfinder could find to sufficiently support the nonmoving party's assertion of material facts. *See Ting*, 927 F.2d at 1510-11, 1515.

Baylis joined the project late 2010 without any employment or service relationship and was still claiming unemployment benefits (DR 25 at ¶¶ 82-83), whilst creating his high level 3D animated work which found its way into the film *Iron Sky*.

Due to his higher skills at using Autodesk Maya Software (industry standard software for films) Baylis was elevated to modelling supervisor, and has genuinely the best knowledge about how the Work was created in terms of the 3D animation work, and by whom. "As for Götterdämmerung, Baylis had finally become a supervisor because Puukko had his hands full elsewhere... Torssonen had suggested that Baylis take over the job. All the modeling of Götterdämmerung eventually went through Baylis and Baylis had made all the moving parts for it. The management of the film had also asked Baylis to act as an instructor for the models,"(DR 49-3 at BAYLIS_21) (Kulmala, J.)

In contrast the Producer, Kaukomaa and VFX vendor Torssonen, along with other crew members, were in Germany and Australia from late 2010 to spring 2011 (DR 25 at ¶¶ 86-87, at 38 ¶ 92, DR 44-2 Ex. B, at 16.) They were as far away from Baylis as it is possible to be in the world when he created his Work, and so of course, had no real idea about the Work Baylis created.

Baylis also remains the only person in the world that has even given any substantial demonstration of the actual 3D animation files to judges in previous cases because of the complexity of the files and the skills required to demonstrate them. The record below contains numerous videos of Baylis demonstrating the Work from his home where he keeps many of the original 3D files he obtained from the courts in Finland, (DR 85 Exs. F through, P) (Video files). Valve dispute none of this.

The main activity of an animator such as Baylis is to make images that when viewed in a sequence, give the illusion of movement, also known as "motion pictures." Baylis has done exactly that for the Work, thus creating a work subject to copyright in general. *See* 17 U.S.C. §§ 101, 101(6) (subject matter of copyright - definitions of "Audiovisual works" and "Motion pictures").

"A work is considered a "joint work" if it is "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (defining "joint work"). *See also*, *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 1999) ("[w]here the visual aspect of the movie is especially important, the chief cinematographer might be regarded as the author. And for, say, a Disney animated movie like "The Jungle Book," *it might perhaps be the animators*" [emphasis added].)

The threshold of originality for copyright to arise in a work is extremely low and under EU law the minimum level of originality can be as low as an "eleven word sentence." *See* Infopaq C-5/08.

There has never been a dispute that Baylis' Work did not "originate from him," and even just simple "polygon arrangement" of a 3D model is enough to reach the very low threshold of copyright originality. For example in

*Glass Egg Digital Media v. Gameloft*, No. 17-cv-04165, 2018 WL 3659259 (N.D. Cal. Aug. Page 102, 2018), the court found there was at least some minimal degree of creativity in 3D polygon models that resembled real world cars that were adapted for use in a game engine:

> "Assuming the polygon arrangements can be separated from the shape and appearance of the cars, the above allegations are sufficient to show such arrangements are the product of expressive choices made at the discretion of Glass Egg's employees, and thus to show the Works were "independently created" by those employees and "possess[] at least some minimal degree of creativity." *See* [*Feist, Publications v. Rural Telephone Services, Co.*, 499 U.S. 340, 348 (1991)]; *see also*, e.g., *Phantomalert, Inc. v. Google Inc.*, No. 15-CV-03986, 2016 WL 879758, at *1 (N.D. Cal. Mar. 8, 2016) (holding "information shown on a map is not subject to copyright protection," but "the arrangement of the facts depicted on the map is protectable where it shows some originality"; finding placement of traffic-related information on map protectable where based on "judgment calls") (emphasis in original).

*Id.* at *4-*5.

Additionally, Baylis' 3D models themselves are joint works coordinated by Baylis through his own hands-on modelling using Maya 3D software, and selection and arrangement of other 3D models which he oversaw as he came in charge of the whole Work's modelling team due to his better experience and expertise, as testified to by witness Risto Puukko in *Baylis v Troll VFX*, (DR 49-3, Ex. D, at BAYLIS_20-21.) After examining the *Iron Sky* 3D animation files, Judge Kulmala in *Baylis v Troll VFX* concluded that, "one cannot come to any other conclusion than that Baylis had worked as an animator before his employment with Troll VFX in the *Iron Sky* film project." *Baylis v Troll VFX*. (DR 49-3, Ex. D, at BAYLIS_26.)

**B.    Authorship Analysis Performed in Preparation
for the U. S. Copyright Office Registration.**

From Baylis perspective, he was confirmed as author of the Work by
Judge Kulmala in *Baylis v Troll VFX*. Despite the Finnish Market Court in the
MAO302/18 case sidestepping this, it remains a fact to this day that Baylis'
name is in the metadata of the original *Iron Sky* 3D animation files which, were
in evidence in both  *Baylis v Troll VFX* and MAO302/18. The Finnish Market
Court attempted to create an "orphan work" status for *Iron Sky*. (See Lawyer Perti
Eskola's analysis, DR 110-1 Ex. B, at BAYLIS_3.) Never-the-less, orphan works
remain protected by copyright and the Work is a German Work, not a Finnish
work. Finland's own laws are limited to Finland and simply should not be allowed
to override the United States law in this particular case.

Importantly, the Work is a Berne Convention Work and so Baylis can seek
protection under Berne Convention Article 15 which, just requires that Baylis'
name be on the Work, which it is. (E.g. DR 49-3 at BAYLIS_11; DR 44-2 Ex. B, at
14; DR 85 at ¶¶ 7, 27, Exs. B1, P .)

Further under Berne Convention Article 6bis Baylis can once again claim
ownership of his Work to "de-orphan it" and seek protection of it again under
Berne Convention article 5(2). Then, because the United States is a Berne
Convention member, Baylis can seek protection under United Sates laws through
the doctrine of *lex loci protectionis* or "law of the place where protection is sought"
(Berne Convention Article 5(2)) which, he is doing.  He can independently register
his copyright at the United States Copyright Office regardless of it being a Berne

Convention Work, and also because under Berne Convention 6bis he can always claim authorship of his Work. Such things are "unalienable rights."

Baylis' authorship analysis is supported by the evidence in the record. He was the modelling supervisor for the whole project, and almost all 3D models related to the Work had to go through him at some stage (DR 49-3 at BAYLIS_21.) Baylis has personal knowledge of the roles of all other artists including the owner of the VFX vendor company Torssonen and Art Director Jussi Lehtiniemi ("Lehtineimi") who appeared as witnesses against the 3D artists in all three Finnish actions against Baylis in *Baylis v Troll VFX* despite their limited knowledge of Baylis' own Work, and their lack of any evidence to show they have any competence to do 3D animation, and Torssonen being in Germany and Australia from late 2010 to spring 2011 (DR 25 at ¶¶ 86-87, at 38 ¶ 92, DR 44-2 Ex. B, at 16.) It is true that not everyone who worked on the film contributed actual authorship to the film and ironically that includes Torssonen and Lehtiniemi.

In terms of providing names of authors to the United States Copyright Office office, Baylis arrived at the names listed by "process of elimination" of those who could not possibly be regarded as authors due to lack of their own fixed expression appearing in the Work, such as in the actual images that make up the final Work, regardless of their other contributions to the Work such as, providing facilities, or having supervising roles, or making suggestions without their own personal fixed creative expression in the final Work itself.

The subject matter of copyright under United States law arises in original works of authorship fixed in any tangible medium of expression which include (1) literary works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and

other audiovisual works. 17 U.S.C. §102. Equally important are the exceptions: "(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

Therefore, Lehtiniemi who may have put forward ideas, and concepts, and reference images but is none the less excluded from authorship of the film because his ideas and concepts were never actually fixed as any tangible medium of expression as the significant images that go together to give the illusion of movement of the film itself under 17 U.S.C. §102(6). (DR 85-5) (Lehtiniemi) "There's no point really concepting everything. So, you know, drawing it from scratch. So, you take some reference pictures and you point out that this is what we want to have."

In the case of Torssonen, his role was important to the project as a whole regarding organization and he was titled as a supervising project manager (VFX Supervisor), providing working space and equipment as well as IT support. He had no authorship role regarding the images of the film and his involvement in Germany and Australia was as a technician to help with the green-screen studio set-ups, which does not amount to authorship (DR 25 at ¶¶ 86-87, at 38 ¶ 92, DR 44-2 Ex. B, at 16).

Then there are artists known to Baylis listed in the end credits of the Work who did simulation work (Dynamics animations) such as for example, Tuomas Kankola (DR 85-4 Ex. B1) that requires procedural animations, such as dust, sparks and explosions. This type of work requires the computer to do calculations based on

parameters set in the software user interface, and as such, those parameters are not necessarily fixed "before" the computer itself fixes files to disc and are thus merged as a "method of operation" for a software function. Such things are necessary for the film but would fall under exceptions under 17 U.S.C. §102(b).

It is notable that this type of analysis regarding the components of authorship of the Work is entirely absent from the Finnish Market Court's dicta in MAO302/18.

### 1.    U. S. Copyright Office Registration.

The Register of the United Sates Copyright Office ("Register") has investigated Baylis' United States Copyright Registration after being requested to do so by the lower court  pursuant to 17 U.S.C. §411(b)(2), (DR 60). The Register confirmed the Work is subject to copyright under United States law and confirmed Baylis' claims of authorship are legitimate because there are no written transfers of copyrights nor any "work for hire" agreements that would make the Producer the owner of any copyright, and also, foreign rulings are irrelevant due to protection in the United States being exclusively based on United States Law. (DR 66-1).

Valve argued to the lower court that Baylis should have ignored all evidence he himself adduced that makes him the author, as well as all evidence a reasonable factfinder can see objectively that Baylis is the author of his own Work. <u>Valve instead wanted Baylis to misrepresent to United States Copyright Office that he is *not* the author of his own Work</u>, despite that knowingly making a false representation of a material fact in a United States copyright application is a criminal offense. Essentially Valve asks Baylis to engage in a criminal offense by misrepresenting to the Register that Baylis is not the author of his Work even though he knows full well he *is* the author.

There is substantial evidence in the record from which any reasonable factfinder could find that Baylis is a legitimate joint author to the Work including and especially that his name appears in the metadata of the original 3D animation files, and he has demonstrated the Work to the lower court via video evidence and to Judge Oskar Kulmala in *Baylis v Troll VFX* (DR 49-3, Ex. D, at BAYLIS_26; DR 85 Exs. F through, P) (Video files).

## 2.    Response of the Register of Copyrights to the Investigation Request.

Valve moved for review of Baylis' copyright registration pursuant to 17 U.S.C. §411(b)(2) to determine whether  a foreign ruling, if known, would have caused the Register of Copyrights to refuse registration. (DR 43.) The Court granted Valve's motion and ordered referral to the Register of the United Sates Copyright Office (DR 60.)

The Register conducted the investigation and reported back to the lower court. The Register informed the lower court specifically that, "The U.S. Constitution and Copyright Act are the exclusive sources of copyright protection in the United States. When examining an application for registration, the Office applies title 17 of the U.S. Code, and all applicants must demonstrate that a work satisfies the requirements of U.S. copyright law in order to register a work with the Office. Thus, in determining whether a work is copyrightable, a joint work, or a work made for hire, the Office applies U.S. copyright law, even if the work was created in a foreign country, first published in a foreign country, or created by a citizen, domiciliary, or habitual resident of a foreign country." (Report of the Register, DR 66 -1, at 5-6 (citations omitted)).

The Register confirmed that the Work was subject to copyright and that because Baylis was not working under any "work for hire" agreements then Baylis is factually the author and still the owner of the copyright to his Work: "The Supreme Court has explained that, unless the work is a work made for hire,"'the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.'" (DR 66-1, at 6: 5-8).

This means that Baylis is still the copyright owner of his own Work, and this alone is a genuine material fact based on sufficient evidence for "a reasonable jury to return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-49.

Baylis also supported his Copyright Registration with significant evidence from which a reasonable factfinder could find demonstrates that Baylis is the author of his Work, evidence which Valve themselves brought into evidence into this case (DR 44-2, Ex. B), including newly rendered images and screen grab images from the 3D Maya software interface of Baylis' own computer (*id* at 4, 10, 12), and evidence of his name "trev" in the metadata of the 3D animation files (*id* at 14), and also included examples of the Work's official storyboard (*id* at 5). That storyboard had, "Full CGI" as Baylis' only instructions to follow in creating his Work. (*Id.*), There was also the evidence that the Producer Kaukomaa and Director Vuorensola and VFX supervisor Torssonen were all in Germany and Australia at the time Baylis created a large part of the work operating creatively without supervision (or wages) for six months. (*Id* at 16).

Also included in the evidence was an email correspondence from the initial script writer for the film Johanna Sinisalo confirming the film was never meant to

be a "Johanna Sinisalo film," and that she did not write about the 3D animation parts of the film as that was left up to "the guys" (Baylis included). (*Id* at 17.) All this evidence was later enhanced by Baylis's video demonstration evidence to the lower court where Baylis gave clear demonstrations of the files and explained his creative process in creating the Work (DR 85 Exs. F through, P) (Video files), which a reasonable fact finder could find easily surpass the "modicum of creativity" requirement in *Feist Pubs, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991) ("[o]riginal, as the term is used in copyright, means only that the work was independently created by the author . . . , and that it possesses at least some minimal degree of creativity").

However, both Valve and the lower court ignored all of this salient evidence and doubled down on their circular reasoning fallacy, asserting that contrary to the evidence in the record, Baylis somehow was not the author of his own Work(??), and despite the law that authorship rights are fact-based "unalienable" rights under Berne Convention Article 6bis that a court cannot deny in any case.

A reasonable factfinder would not, like Valve have, completely ignored the Register's guidance that Valve specifically asked for in this case. Baylis also requested that Valve admit that images created by Baylis are, "... the type of work that any reasonable person would consider to be copyrighted work." Valve simply denied that they would be without any explanation. (DR 59-5 Ex. E, at ¶¶ 1-7.) This only contributes to the hallmark of a circular reasoning fallacy.

At any rate, the US Copyright Office has confirmed: "First, the Finnish court's determination as to joint authorship under Finnish copyright law has no

bearing on the Office's consideration of the Registration. Under the U.S. copyright law, the author is..."the party who actually creates the work." (DR 66-1, at 8.)

## II. THE LOWER COURT CONFLATES COMITY WITH CHOICE - OF - LAW ANALYSIS AND RELIES ON A RULING LACKING JURISDICTION.

### A. The Lower Court's Ruling Relies Upon a Foreign Ruling Lacking Subject Matter Jurisdiction, and Void Ab Initio.

#### 1. Three Previous Foreign Cases.

There were in fact three previous cases in Finland.

- *Baylis v Troll VFX:* L 15/3246821 - 21. Oct. 2016.

- MAO:302/18: *A, B, C, D and E  v Blind Spot Pictures Oy and Iron Sky Universe Oy*: 2017/588. 31. May. 2018.

- MAO:302/18 - Counterclaim: *Blind Spot Pictures Oy and Iron Sky Universe Oy v A, B, C, D and E*: 2017/701. 31. May. 2018.

All three cases concern Baylis' Work on *Iron Sky,* and the same 3D animation files were submitted as evidence in all cases, evidence that was placed before the lower court. *None* of these cases affirmatively *deny* Baylis' his copyright in his Work. None of these cases ever involved Valve in any way.

As to what relevance these cases have in this case, the first case confirms Baylis as author of his Work; the result of the second case is void *ab intitio* due to lack of subject matter jurisdiction, the "country of origin" of the Work being Germany, and does not even mention section 1 of the Finnish Copyright Act (subject matter of copyright); and the third case confirms that the Producer is not the legitimate owner of the Work due to the Producer not holding any written transfer of copyright ownership in the Work.

What Baylis' lawyer and former Market Court Judge, the esteemed Petri Eskola makes of the last two cases is that despite Baylis not being found to have infringed any copyright "of his own Work," something of an "orphan work" status emerged perhaps due to the Finnish court realising a lack of its own subject matter jurisdiction, and so the Finnish Market Court in MAO302/18 reversed the idea/expression distinction in copyright law to give importance instead to the unprotected "idea" rather than to the protected creative "expression": "...indeed, these ships seem to be orphan works...In market Court's opinion you [Baylis] are not infringing...I agree that this is taking away from those who actually have created works (to the benefit of those having an "idea", which is not protectable at all)." (Analysis by attorney, Petri Eskola; DR 110-1 Ex. B, at BAYLIS 3.) *See also Google  LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) ("copyrights protect 'expression' but not the 'ideas' that lie behind it"); 17 U.S.C. § 102(b) ("In no case does copyright protect[] . . . any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . described, explained, illustrated, or embodied in [the copyrighted] work.").

The disputes concerning all three Finnish cases arose because Baylis had not been adequately remunerated for his *Iron Sky* Work, especially even receiving unemployment benefits for the first six months working on the project, because the Producer was continuing to use, and pass on to third parties for video games, Baylis' Work, and also because the Producer had plans for a sequel, and set up a Finnish company in 2014 called Iron Sky Universe Oy that raised money from investors through false claims to control the Iron Sky franchise and intellectual property. Baylis had not agreed to any such use of his Work and had certainly not

transfered any copyrights to Iron Sky Universe Oy especially considering he was not and had never been paid for such things even for his previous *Iron Sky* work.

After *Iron Sky* was released in 2012 a new company called Troll VFX was set up by Torssonen involving the same few people left over from the *Iron Sky* team and Baylis was also offered a job at Troll VFX. However, Baylis realized he was being taken advantage of by still not being paid properly which eventually led to the first case, *Baylis v Troll VFX*: L 15/3246821 which was a wages theft, discrimination and unfair dismissal case. Defendants Troll VFX put forward a defense saying that Baylis had not actually worked on *Iron Sky*. It therefore became apparent to Baylis that his lawfully acquired copyrights to his Work were being unlawfully expropriated from him in order for Iron Sky Universe Oy to proceed with their franchise plans and it came out that Torssonen of Energia Productions and now of Troll VFX had unlawfully sold Baylis' Work to Iron Sky Universe Oy for around €200,000 (DR 84 at 17:11-13; DR 85-27, Ex. W, at BAYLIS_8.)

This resulted in Baylis' *Iron Sky* Work being submitted as evidence in *Baylis v Troll VFX*, ("Maya files K21, K27 and K28," DR 49-3, Ex. C, at BAYLIS_8), and Baylis had to demonstrate for three hours in front of Judge Oskar Kulmala that he really was the author of the Work and that Baylis' name "trev" appears thousands of times within the metadata of the 3D files which, was leading Judge Kulmala to conclude: "In relation to the aforementioned animations, Baylis has shown, for example, regarding Maya files K21, K27 and K28, which are evidence, that numerous and numerous files and meta-files have his name, i.e. he was the author of the animations." (DR 49-3, Ex. C, at BAYLIS_11.)

Consequently Baylis won that first Finnish case, and if anything the issue of "who is the author of the Work" was factually resolved in favour of Baylis then in *Baylis v Troll VFX*: L 15/3246821 - 21. Oct. 2016, a ruling that, having subject matter jurisdiction, might even itself be subject to extension of comity and finding of issue preclusion in Baylis's favor. At any rate, at a bare minimum this issue of Baylis' prior confirmation of authorship in his Work, was duly presented to the lower court (DR 49-3, Ex. C), is grounded in evidence on which any reasonable factfinder might agree with the first Finnish court in favor of Baylis, and indeed is what the lower court should really be giving *Res judicata* effect to. (See also DR 45 at 10: 9 -17).

The second case was MAO:302/18: *A, B, C, D and E  v Blind Spot Pictures Oy and Iron Sky Universe Oy*: 2017/588. 31. May. 2018. This is the case that, crucially suffers from a subject matter jurisdiction failure that renders the ruling a legal nullity *ab initio*. Never-the-less, this is the case that Valve relies upon for their defense calling it the "Finnish ruling" while Baylis terms it "MAO302/18." Valve essentially ignore the other two cases, the first *Baylis v Troll VFX* case and the third case of the Producer's Counterclaim in MAO302/18: *Blind Spot Pictures Oy and Iron Sky Universe Oy v A, B, C, D and E*: 2017/701. 31. May. 2018.

Evidence that this "second case" was incoherent, and lacked subject matter jurisdiction to apply the Finnish Copyright Act to questions of authorship for regarding a "German work," was presented to the lower court, (DR 45). The lower court, however, completely ignored it in favour of Valve's misleading interpretation of the ruling instead claiming that Baylis "does not own the copyrights." In reality,

the operative part of this second Finnish Ruling MAO302/18 only mentions limited transferable economic rights under §2 of the Finnish Copyright Act - economic rights (Produce, Display, Market and Distribute) and only in relation to one particular work, the "Japanese ship," because that was the only work the Finnish Market Court in the second case would even confirm to be a copyrightable work that could have transferable rights.

Finnish Copyright Act Section 1 (subject matter), Section 3 (authorship), and Section 4 (adaption rights) are completely absent from the operative part of the second case ruling, and so the copyright proper genuinely still remains with Baylis for his Work as determined by the first Finnish court's ruling. Further, and insofar as any economic rights under section 2 of the Finnish Copyright Act have been deemed transferred, such rights only relate to the "Japanese ship" because those were the only rights to which the Finnish Market Court in MAO302/18 would confirm authorship (DR 45, at 6; DR 44-4, at ¶¶ 52, 53, Ex. D, at VALVE_12; DR 44-4, at ¶ 87, Ex. D, at VALVE_14.) Therefore, whilst Valve assert broadly that "[Baylis] cannot establish copyright ownership in *Iron Sky* or its 3D models and animation because a Finnish court...," <u>what Valve really mean is that Baylis "does not own the copyrights" to the Japanese ship</u>, (*See* DR 104 at 14-15.)

However, overshadowing and invalidating the whole second case is the fact that the Finnish Market Court did not even have subject matter jurisdiction to make any ruling applying the Finnish Copyright Act to the Work. This is because the Work is a German work "First Published in Germany." As Baylis presented to the lower court, under Berne Convention rules the "First publication" overrides all other criteria in setting the "country of origin" for the Work. (E.g. DR 84 at 8 n. 7.)

Baylis for clarity specifically presented the lower court with the explanation of such rules from the *WIPO Guide to Berne Convention* (DR 104 at 7-8; DR 113-11 Ex. K, at 36-37.)

It is a foundational principle of law that it is improper (and legally impossible) to invent or create a court's subject matter jurisdiction for issues over which it has no legal authority to rule. Parties cannot waive legal requirements for jurisdiction, and courts have an independent obligation to verify their own jurisdiction, and the issue can be raised by either party (or the court itself) at any stage of the proceeding, even after a trial has concluded. *See Arbaugh v. Y & H Corp*., 546 U.S. 500 (2006).

The clearest evidence that the second Finnish ruling MAO302/18 attempted to exercise authority over copyright subject matter without jurisdiction can be seen in the analysis of the work by 3D artist and United Kingdom National Seb Barquin ("Barquin") which he created from his home in the United Kingdom. Barquin is identified as plaintiff "A" in the second Finnish ruling MAO302/18 (Also see, DR 88). His 3D work, as distinct from the film but significantly used in the film, was the Rheingold space craft ("Rheingold"). The 3D model Rheingold is listed in the evidence as item "46": "46. Images from the seb_rheingold_lambert.mb file extension." (DR 44-4 Ex. D, at VALVE_007.)

The Finnish Market Court acknowledged that Barquin created the work without payment from his home in the United Kingdom in 2010, (DR 44-4 Ex. D, ¶ 47, at VALVE_012; ¶ 96, at VALVE_015.) However, the court still assessed the work under the Finnish Copyright Act, which it had no authority or jurisdiction to do. The Finnish Market Court made no reference to the United Kingdom's Copyright, Designs and Patents Act 1988 ("CDPA") under any

choice-of-law analysis in its assessment of Barquin's work. This demonstrates the Finnish Market Court attempted to exercise jurisdictional authority over the whole Work when in multiple instances the works involved had a "country of origin" outside of Finland (DR 86 at ¶ 21). "The country of origin shall be considered to be: (a) in the case of works first published in a country of the Union, that country." Berne Convention Article 5(4)(a).

Baylis repeatedly presented evidence to the lower court here that the second Finnish court action was invalid because the Finnish Copyright Act precludes itself from applying its §1 (subject matter of copyright) to a published work that was NOT "first published" in Finland per §63(2) of the Finnish Copyright Act. (DR 104 at 6-10; 2: 10 -14; 3: 8-11; 3: 18-24; 4: 1-24; 5: 6 -12; DR 84 at 1: 12-16; 8: 1- 8; 21: 5-12; DR 79; DR 45 at 1: 19-22; 6:19-21; 7: 21-22; DR 25 at, 8-9, 11.)

The third Finnish case MAO:302/18 - Counterclaim: *Blind Spot Pictures Oy and Iron Sky Universe Oy v A, B, C, D and E*: 2017/701. 31. May. 2018, was just a frivolous attempt by the Producer to sue Baylis for continuing to use his own Work for his own projects. Importantly the Producer lost this case due to not having any copyright ownership of the Work via written conveyances, and therefore, to paraphrase Valve's own assertion, *"[**The Producer**] cannot establish copyright ownership in Iron Sky or its 3D models and animation because a Finnish court – in an action Baylis brought as plaintiff – has already ruled on these exact copyright ownership issues and found, after a full evidentiary hearing in which Baylis participated, that the **Producer** does not own the copyrights."* (Appellant here takes the liberty to paraphrase Valve's assertion in order to emphasize to this Court where the error lies in Valve's and the lower

courts flawed reasoning. The original passage can be found in Dr 98. at 1: 15-19 and DR 76 at 1: 18-21.

A factfinder could find on the evidence in this record that Work remained the property of Baylis due to the absence of any employment relationship or any written assignment of ownership rights to either Torssonen or the Producer (Kaukomaa). Notably in this regard there are no employment contracts nor any written assignment of copyrights in the record.

It should also be noted that <u>the Producer never had standing to seek remedies and intellectual property protections regarding the Work without joining Baylis as an indispensable party to any court action</u> because of the nature of the non-exclusive licensing strategy that was used to obtain 3D animations from Baylis and others creating the Work. *See*, *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 848-49, (N.D. Cal. 2024) (citing *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1004 (9th Cir. 2015) (X Corp did not have exclusive licenses from uploaders to 'X' and therefore has no standing to prevent third parties, such as data scrapers, from using that content).

Therefore, because the Producer had no genuine standing to protect the intellectual property of *Iron Sky*, it was rather foolish of the Producer to get into arguments with copyright owner Baylis about copyrights related to the Work.

The Producer lost their own frivolous court action against Baylis accusing him of copyright infringement. Ironically, this is part of the same Finnish ruling MAO302/18, that Valve lured the lower court into applying comity and collateral estoppel to. However, due to this other portion of the same Finnish ruling MAO302/18, <u>it is in fact the Producer who cannot prove copyright ownership to</u>

the Work: "The production companies have not argued or presented any evidence to establish who, if anyone, has acquired the copyright in the vessel and whether the copyright in the vessel has been exclusively transferred to the production companies the Market Court considers that this infringement of copyright has not been proven..." (DR 44-1, Ex. D at ¶ 108.)

Similarly in, *DRK Photo v. McGraw-Hill Global Education Holdings, LLC*, (9th Cir. 2017) it was held that the plaintiff a stock photography agency that markets and licenses images created by others to publishing entities, was merely a non-exclusive licensing agent for the photographs at issue, *id*. at 983-87, and so had failed to demonstrate adequate ownership interest in the copyrights to confer standing. *Id*. at 987. It was also held that plaintiff DRK lacked standing as a beneficial owner of the copyrights. *Id*. at 988.

**2. The Evidence Is Sufficient for a Fact Finder to Agree with Baylis on the Fact of First Country of Publication That Invalidates the Second Finnish Ruling and Renders It Unfit for Comity.**

As in the case before the lower court here the Finnish Market Court in MAO302/18 did not conduct the proper choice-of-law analysis to determine which nation's laws apply for questions related to initial ownership (authorship) of the Work, i.e., the subject matter of copyright "point of attachment" to the Work and the "country of origin" jurisdiction from where that point of attachment took place.

The Finnish Copyright Act precludes itself from applying it's own §1 (subject matter of copyright) to a published work that was NOT "first published" in Finland under §63(2) of The Finnish Copyright Act.

Any reasonable factfinder in the record before the lower court could find the Work is a "published work" but was NOT "first published" in Finland. Any reasonable fact finder could find by a preponderance of the evidence in the record that the Work was "first published" in Germany, at the Berlin Film Festival on 11th February 2012 to a paying audience and offered up then for further distribution, (DR 84 at 21: 5-12; DR 85, Exs. A1, Y, and Z (video evidence), DR 113 at 4: 14-23; DR 113 -1, -2, -3, -4, and -7; Ex A, B, C, D, and G.) Plaintiff Baylis can also testify to this; he was there. What is not in the record is any evidence that the Work was ever published or displayed in Finland or any other location at any time prior to the Berlin Film Festival.

The Finnish Market Court in MAO302/18 could have applied a proper choice-of-law analysis based on country of "first publication" under the Berne Convention and the Finnish Copyright Act to determine that German Copyright law applied to the questions of initial ownership of the Work, but instead inexplicably went against the explicit statutes and gave deference to the place of initial conception of the Work (a sauna in Finland), thus reversing the idea/ expression distinction in copyright law, and improperly inventing its own subject matter jurisdiction over the Work, a legal impossibility.

Therefore, any reasonable factfinder could find facts that invalidate the second Finnish ruling MAO302/18 cited by Valve, and relied upon by the lower court in extending comity and then *res judicata*, both of which the second Finnish ruling is not worthy of, is a legal nullity *ab initio* due its lack of subject matter jurisdiction.

### B.    Choice-Of-Law Analysis, Not Comity, Establishes Which Country's Laws Apply to Determine Who is Author of a Work.

Conflating choice of law and comity in copyright ownership issues occurs when a court mistakenly applies the wrong legal principle to determine which country's laws apply. Choice of law involves determining which jurisdiction's laws govern a dispute, whereas comity is the principle by which courts in one country may recognize and enforce the laws and judgments of another country as a matter of courtesy and respect, <u>but comity is not the mechanism for determining the applicable law itself.</u> Baylis has always had the right to claim authorship of his Work under Berne Convention Article 6bis: "(1) Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work..."

It is actually the Berne Convention Implementation Act of 1988 ("BCIA") that the lower court should have referred to rather than being misled by Valve in applying the *Hilton* factor test from *Hilton v. Guyot* | 159 U.S. 113 (1895) in considering issues of initial authorship of the Work.

It is the BCIA that refers to protection of Berne Convention works and it is undisputed that Baylis' Work is a Berne Convention Work and may be protected as such under United States Laws.

> foreign works are exempt from the rule requiring registration of a work prior to the filing of a lawsuit. 'Congress removed foreign works from Section 411(a)'s dominion in order to comply with the Berne Convention for the Protection of Literary and Artistic Works' bar on copyright formalities for such works.'
> [*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 306-07 (2019)](citation omitted).

*Cong v. Zhao*, No. 2:21-cv-01703, 2024 WL 3091187, at *3 (W.D. Wash. June

21, 2024); *See also*, U.S. Copyright Office Compendium Chapter 2000, Section

2003.2 (B), **Eligibility Based on Location of First Publication** ("Section 104(b)

(2) of the Copyright Act affords protection to all works that are first published in (i)

the United States, or (ii) a foreign nation that, on the date of the first publication,

is a treaty party. In other words, regardless of the nationality or domicile of the

author(s), a work may be eligible for protection under the Copyright Act if it is first

published in the United States or in any nation that has a relevant treaty with the

United States at the time of the first publication." )

Baylis has always had the right to claim authorship of his Work under Berne

convention Article 6bis, and he informed the lower court by filing notice of a need

to perform a choice-of-law analysis in this case. (DR 19; DR 113-5, Ex. E.) He did

this to ensure this the lower court's proper determination for initial ownership of

copyright would be based on German Law under the correct choice-of-law

analysis. (*See Itar-Tass,* 153 F.3d at 91 (2d Cir. 1998) holding that "country of

origin" determines initial ownership (authorship) of copyright).

### C.     Comity Does Not Compensate for Lack of Jurisdiction to Determine Who is Author of a Work.

Baylis presented the lower court with United States case law confirming

that authorship is not question of law. ("Authorship is a question of fact." *S.O.S.,*

*Inc.*, 886 F.2d at 1086 (citing *Del Madera Props. v. Rhodes & Gardner, Inc.*,

820 F.2d 973, 980 (9th Cir. 1987)). Copyright in a work "vests initially in the

author or authors" of a work. 17 U.S.C. § 201(a). "As a general rule, the author

is the party who actually creates the work .…" *Reid*, 490 U.S. at 737; (1989), *see*

*generally* DR 84 at 2.

While comity (respect for other nations' laws) might govern economic disputes such as contractual transfer of copyrights disputes, Berne Convention Article 6bis asserts a universal authorial claim, making denial of authorship a direct violation of this international standard. *See* e.g., *Pony Express Records, Inc. v. Springsteen*, 163 F. Supp. 2d 465 (D.N.J. 2001). *Pony Express* was essentially a contract dispute about ownership of economic rights and not a "fact based" authorship dispute, as Springsteen cannot be denied authorship of his own work by some imagined rule of law that comity could apply to.

> In his motion for summary judgment on plaintiffs' claims, Springsteen contends that the UK Judgment estops the plaintiffs from litigating the critical issue of whether Cretecos had obtained any individual interest in Springsteen's recordings through Springsteen's agreement with Sioux, Inc., and whether the property of Sioux, Inc. is distinct from the property of Sioux, Ltd.. Springsteen also contends that the undisputed material facts establish that Springsteen owns the copyright in the contested compositions and sound recordings, and therefore, Springsteen should be granted summary judgment.

*Id*. at 476.

A court's refusal to recognize authorship under Berne Convention Article 6bis is not just a failure of international courtesy (comity), it is a failure to uphold a core, non-negotiable principle of international copyright law that protects the author's very personhood. Denying authorship is not just a procedural step in some frivolous defense by Valve, it is a fundamental affront to Baylis's identity in relation to his own Work that is protected by the Berne Convention. It is simply a fundamental common decency to recognize Baylis' Work as Baylis' own personal Work and that he is the author of that Work. From there, Valve's lack of license or rights to Baylis's Work and Valve's concomitant infringement of Baylis's copyright falls into place easily.

### III. THE LOWER COURT'S REFUSAL TO RECOGNIZE COPYRIGHT AUTHORSHIP AND OWNERSHIP LEADS TO A TACIT IMPROPER "ORPHAN WORK DEFENSE."

#### A. The Lower Court Ruling Would Allow Unauthorized Copying and Distribution of Works Deemed "Orphaned Works."

An orphan work, according to the U.S. Copyright Office, is a work that is protected by copyright but whose copyright owner cannot be readily identified or located. This, in essence, is Valve's defense against infringement of Baylis' Work.

Valve are essentially claiming that, because a Finnish ruling MAO302/18 would not provide protection of the Work,[2] by deeming the Work an orphan work (see for example, analysis of lawyer Perti Eskola at DR 110-1 Ex. B, at BAYLIS 3), then Baylis should not be allowed to litigate the same issue in a United States Court under principles of comity and collateral estoppel.

However, even if the Work at issue were an orphan work based on a Finnish ruling MAO302/18 that does not mean that the Work is not still protected by copyright in the United States under United Sates law (*See* generally guidance from the U.S. Copyright Office Register DR 66 -1.) Specifically, it does not absolve Valve of doing their own due diligence to seek permission to exploit the Work or negotiate licensing terms.

To begin with, there is no "orphan work" defense in the United States. *See United States v. Gordon*, 37 F.4th 767 (1st Cir., 2022). In that case, defendant

---

[2] This ruling is in violation of obligations to the Berne Convention on national treatment provision, and a human rights violation see DR 104 at 9: 7 - 10 and, reference to *Safarov v. Azerbaijan* - 885/12.

Gordon "believed that his sales were permitted based on the DVDs' status as orphan works and on the fair use doctrine. As to orphan works, Mr. Gordon testified that he believed that if the owner of content no longer existed, he was free to reproduce it..." *Id*. at 771. Unfortunately for Mr Gordon, he failed with that defense and the jury was instructed against it, *id*., and he was convicted for criminal copyright violations.

The United States Copyright Office does offer due diligence standards for orphan works, focusing on a "good faith diligent search," that requires users to reasonably search copyright records, databases, publications, and expert help for rightsholders, documenting all steps to find owners and avoid infringement.

Valve are not even claiming to have done any due diligence search to determine who the authors of the Work are in order to obtain licenses from them to commercially exploit their "orphan" work. Valve are not claiming to own any license as part of any affirmative defense. (DR 54 at 15-19.) They are simply attempting to obfuscate authorship issues and continue to commercially exploit Baylis Work for monetary gain without any valid license from any legitimate copyright owners via any valid chain of title whatsoever. This means that even under an "orphan works" regime Valve are still commercially exploiting Baylis' Work for commercial and monetary gain without license and so are still directly and contributorily infringing Baylis' copyright under cover of the lower court's erroneous summary judgment ruling.

### B. The Lower Court's Ruling does Nothing to Solve the Problem in this Case.

Nothing has actually been resolved by the lower courts granting of summary judgment other than to create an "orphan work status" of Baylis Work which is still being infringed by Valve despite the presence of significant evidence Baylis presented the lower court in the record from which a reasonable factfinder could find Baylis is the genuinely the author of the Work. *See Ting*, 927 F.2d at 1510-11, 1515.

Therefore, by ignoring material facts and law such as authorship being an "unalienable right," and being a question of fact not law (*S.O.S., Inc.*), ignoring evidence in the record, engaging in circular reasoning, the lower court basically allows Valve a non-existant "orphan works defense," and the lower court allows Valve to avoid liability for commercially exploiting Baylis' Work as a video game adaptation and in other ways without any license from the actual legitimate copyright owner.

### CONCLUSION.

As noted at the beginning, the issue is simple: Baylis is the owner of a valid copyright in his Work; Valve is infringing that copyright by using that Work without any license and without paying for it. On summary judgment all facts and inferences are presumed in favor of the non-moving party (Baylis), and on the evidence in this record a reasonable factfinder could find by the preponderance of the evidence that Baylis is the author of the Work at issue. The lower court failed to presume the facts and inferences in Baylis' favor, and so erroneously applied improper legal concept of comity, *res judicata*, and implicitly an "orphan works defense." This was material error and must be reversed.

For the foregoing reasons, the judgment of the district court should be reversed, and the lower court directed to bring the guidance of the Register of the Copyright Office and the other evidence to the fact finder for determination of all factual issues, including Baylis's ownership and authorship in the Work, the application of Baylis's copyright, and Valve's infringement and damages.

DATED this 7th day of January, 2026.

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560 Tampere FINLAND
+358 41 722 5899

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Certificate of Compliance for Briefs

Case Number: 25-7126

I am a self-represented party.

This brief complies with FRAP 32(a)(7)(B)(i) and contains 12151 words,

excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 7th day of January, 2026.

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560 Tampere FINLAND
+358 41 722 5899

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Certificate of Service for Electronic Filing

Case Number: 25-7126

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the Ninth Circuit using the Appellate Electronic Filing system.

Jeremy E Roller: jroller@aretelaw.com,

Jonah O. Harrison: jharrison@aretelaw.com,

jfischer@aretelaw.com,

kgreenberg@aretelaw.com

Arete Law Group, 600 University Street, Suite 2420 Seattle, WA 98101

Scott Bolden
Director Intellectual Property Section Commercial Litigation Branch
Civil Division U.S. Department of Justice

Scott.Bolden@usdoj.gov

DATED this 7th day of January, 2026.

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560 Tampere FINLAND
+358 41 722 5899

# ADDENDUM

## TABLE OF CONTENTS

**United States Code Title 17**

17 U.S.C. § 101 ....................................................................3a

17 U.S.C. § 102 ....................................................................9a

17 U.S.C. § 103 ..................................................................10a

17 U.S.C. § 104 ..................................................................11a

17 U.S.C. § 106 ..................................................................12a

17 U.S.C. § 201 ..................................................................13a

17 U.S.C. § 202 ..................................................................14a

17 U.S.C. § 204 ..................................................................14a

**Berne Convention for the Protection of Literary and Artistic Works (Paris Act, 1971)**

Article 3 ..............................................................................15a

Article 5 ..............................................................................16a

Article 6bis .........................................................................17a

Article 15 ............................................................................18a

**Guide To The Berne Convention for the Protection of Literary and Artistic Works (Paris Act, 1971)**

Article 3, paragraph (1) ......................................................19a

Article 5, paragraph (4) ......................................................19a

**§63(2) of Finnish copyright act** ........................................22a

**German Act On Copyright And Related Rights**
   **(Urheberrechtsgesetz – UrhG translation by Ute Reusch)** ...................22a

**Television "The Tunnel"**
   **District Court of Munich ZUM-RO2001/2**............................................27a

**Copyright Law Of Germany Encyclopedia,**
**Science News & Research Reviews**.................................................... 28a

# UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1 - SUBJECT MATTER AND SCOPE OF COPYRIGHT

### 17 U.S.C. § 101 Definitions[1]

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

---

[1] Definitions and other provisions, treaties, statutes, and other regulations or rules are limited selections for relative to this particular case No. 25-7126 for practical reasons. Other statues and laws may apply.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made

simultaneously with its transmission.

An "international agreement" is—

    (1) the Universal Copyright Convention;

    (2) the Geneva Phonograms Convention;

    (3) the Berne Convention;

    (4) the WTO Agreement;

    (5) the WIPO Copyright Treaty;

    (6) the WIPO Performances and Phonograms Treaty; and

    (7) any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.

A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a

substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if—

(1) in the case of a published work, the work is first published—

(A) in the United States;

(B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical

arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities. In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, nor the deletion of the words added by that amendment—

(A) shall be considered or otherwise given any legal significance, or

(B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination, by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

## UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1 - Subject matter of copyright: In general

**17 U.S.C. § 102**

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise

communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

## UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1 - Compilations and derivative works

**17 U.S.C. § 103**

(a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 1 - Subject matter of copyright: National origin**

**17 U.S.C. § 104**

(a) Unpublished Works.—

The works specified by sections 102 and 103, while unpublished, are subject to protection under this title without regard to the nationality or domicile of the author.

(b) Published Works.—The works specified by sections 102 and 103, when published, are subject to protection under this title if—

(1) on the date of first publication, one or more of the authors is a national or domiciliary of the United States, or is a national, domiciliary, or sovereign authority of a treaty party, or is a stateless person, wherever that person may be domiciled; or

(2) the work is first published in the United States or in a foreign nation that, on the date of first publication, is a treaty party;

For purposes of paragraph (2), a work that is published in the United States or a treaty party within 30 days after publication in a foreign nation that is not a treaty party shall be considered to be first published in the United States or such treaty party, as the case may be.

(c) Effect of Berne Convention.—

No right or interest in a work eligible for protection under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto. Any rights in a work eligible for protection under this title that derive from this title, other Federal or State statutes,

or the common law, shall not be expanded or reduced by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 1 - Exclusive rights in copyrighted works**

**17 U.S.C. § 106**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 2 - COPYRIGHT OWNERSHIP AND TRANSFER**

**17 U.S.C. § 201**

Ownership Of Copyright

(a) Initial Ownership. —Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

(d) Transfer of Ownership.—

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

(e) Involuntary Transfer.—

When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 2 - Ownership of copyright as**
**distinct from ownership of material object**

**17 U.S.C. § 202**

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 2 - Execution of transfers of copyright ownership**

**17 U.S.C. § 204**

(a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

**BERNE CONVENTION FOR THE PROTECTION OF LITERARY
AND ARTISTIC WORKS (PARIS ACT, 1971)**

## Article 3

(1) The protection of this Convention shall apply to:

   (a) authors who are nationals of one of the countries of the Union, for their works, whether published or not;

   (b) authors who are not nationals of one of the countries of the Union, for their works first published in one of those countries, or simultaneously in a country outside the Union and in a country of the Union.

(2) Authors who are not nationals of one of the countries of the Union but who have their habitual residence in one of them shall, for the purposes of this Convention, be assimilated to nationals of that country.

(3) The expression "published works" means works published with the consent of their authors, whatever may be the means of manufacture of the copies, provided that the availability of such copies has been such as to satisfy the reasonable requirements of the public, having regard to the nature of the work. The performance of a dramatic, dramatico-musical, cinematographic or musical work, the public recitation of a literary work, the communication by wire or the broadcasting of literary or artistic works, the exhibition of a work of art and the construction of a work of architecture shall not constitute publication.

(4) A work shall be considered as having been published simultaneously in several countries if it has been published in two or more countries within thirty days of its first publication.

**Article 5**

(1) Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

(2) The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

(3) Protection in the country of origin is governed by domestic law. However, when the author is not a national of the country of origin of the work for which he is protected under this Convention, he shall enjoy in that country the same rights as national authors.

(4) The country of origin shall be considered to be

   (a) in the case of works first published in a country of the Union, that country; in the case of works published simultaneously in several countries of the Union which grant different terms of protection, the country whose legislation grants the shortest term of protection;

   (b) in the case of works published simultaneously in a country outside the Union and in a country of the Union, the latter country;

   (c) in the case of unpublished works or of works first published in a country outside the Union, without simultaneous publication in a country of the Union, the

Page 16a

country of the Union of which the author is a national, provided that:

(i) when these are cinematographic works the maker of which has his headquarters or his habitual residence in a country of the Union, the country of origin shall be that country, and

(ii) when these are works of architecture erected in a country of the Union or other artistic works incorporated in a building or other structure located in a country of the Union, the country of origin shall be that country.

**Article 6bis**

(1) Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

(2) The rights granted to the author in accordance with the preceding paragraph shall, after his death, be maintained, at least until the expiry of the economic rights, and shall be exercisable by the persons or institutions authorized by the legislation of the country where protection is claimed. However, those countries whose legislation, at the moment of their ratification of or accession to this Act, does not provide for the protection after the death of the author of all the rights set out in the preceding paragraph may provide that some of these rights may, after his death, cease to be maintained.

(3) The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

**Article 15**

(1) In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner. This paragraph shall be applicable even if this name is a pseudonym, where the pseudonym adopted by the author leaves no doubt as to his identity.

(2) The person or body corporate whose name appears on a cinematographic work in the usual manner shall, in the absence of proof to the contrary, be presumed to be the maker of the said work.

(3) In the case of anonymous and pseudonymous works, other than those referred to in paragraph (1) above, the publisher whose name appears on the work shall, in the absence of proof to the contrary, be deemed to represent the author, and in this capacity be shall be entitled to protect and enforce the author's rights. The provisions of this paragraph shall cease to apply when the author reveals his identity and establishes his claim to authorship of the work.

(4)

   (a) In the case of unpublished works where the identity of the author is unknown, but where there is every ground to presume that he is a national of a country of the Union, it shall be a matter for legislation in that country to designate the competent authority who shall represent the author and shall be entitled to protect and enforce his rights in the countries of the Union.

   (b) Countries of the Union which make such designation under the terms of this provision shall notify the Director General by means of a written declaration giving

full information concerning the authority thus designated. The Director General shall at once communicate this declaration to all other countries of the Union.

## GUIDE TO THE BERNE CONVENTION FOR THE PROTECTION OF LITERARY AND ARTISTIC WORKS (PARIS ACT, 1971)

### Article 3, paragraph (1)

3.2. This paragraph gives the benefit of protection to :

(a) authors who are nationals of a country of the Union for their works, published or unpublished: the point of attachment is the nationality of the author (personal criterion) :

(b) authors who are not nationals of a country of the Union but who publish their works for the first time in one of those countries or arrange that the publication of their works takes place simultaneously in a country outside the Union and in a Union country: the point of attachment is the place of first publication (geographical criterion).

3.3. In the first case, only the nationality of the author counts; in the second, one must consider where the work was published for the first time. (*Id* page 26).

### Article 5, paragraph (4)

5.13. These extensions of the Convention's field of application have consequences as to the country of origin of works. This paragraph identifies three cases.

5.13.(a) works protected by the Convention by virtue of the geographical criterion (place of first publication) and published only within the Union: country of origin is the country of the Union where the work was first published. Place of publication (geographical criterion) prevails over the nationality or the habitual

Page 19a

residence (personal criteria): a Belgian author or one habitually resident in Belgium first publishes his work in the German Federal Republic; the country of origin is the latter country. The Convention also covers "simultaneous" publication i.e., within thirty days of the first. If the work is simultaneously published in several countries of the Union the country of origin is that whose legislation grants the shortest term of protection.

Note that the Convention assumes differing terms of protection in the two countries. It does not cover simultaneous publication in several countries each with the same term (the point is not academic since most countries have adopted the minimum laid down in Article 7). It seems that, here, courts must, if need be, decide, on the basis, for example, of the exact date of the various publications or perhaps the size of one edition as against the other. But the point may be only of academic importance in another sense. In the great majority of cases, the country of origin is only of importance to determine the term of protection, and, in the above hypothesis, all terms are the same.

5.13.(b) works protected by the Convention by virtue of the geographical criterion (place of first publication) and published simultaneously within and outside the Union: in this case the country of the Union prevails over the other to decide which is the country of origin of the work.' (*Id* page 36)

5.13. (c) works protected by the Convention by virtue of the personal criterion (nationality or habitual residence) which are unpublished or first published outside the Union: the Convention lays down that the country of origin is the country of the Union of which the author is a national. Note that this provision

only takes into consideration the nationality of the author and not the other aspect of the personal criterion, that of habitual residence.

Take the case of an author who, without being a national of a country of the Union, nevertheless habitually resides there. Should the same rule be applied here to decide the country of origin of his unpublished works as those first published in a country outside the Union without simultaneous publication within? It seems that the answer is yes, because this paragraph assimilates habitual residence to nationality for all purposes of the Convention, and one can therefore assume that the country of origin is that of his habitual residence when he is not a national of a Union country. Of course unpublished works of authors who are neither Union nationals nor residents remain outside the protection of the Convention altogether.

5.14. Paragraph (4)(c) lays down two exceptions to the normal rules applicable to unpublished works or those first published outside the Union.

5.14.(i) The first deals with cinematographic works and is the logical corollary to the new point of attachment introduced in the Stockholm Act (1967). The country of origin is determined by the headquarters or habitual residence of the maker; this general formula prevails over the other personal criterion, nationality or habitual residence of the author. The reason is that films by their nature are often works in which several authors collaborate ; the use of a personal criterion would produce confusion if these had different nationalities or residence, as is often the case.

Note, however, this only applies to unpublished works or those first published outside the Union. If the work is first, or simultaneously, published in a Union country the general rules of paragraphs (4)(a) and (b) apply. This exception merely recognises that films are often unpublished and, if the

country of origin were to depend on the nationality of the many coauthors, this would give rise to legal confusion whereas basing this on the maker (as in the points of attachment) makes for much more clarity. (*Id* page 37).

## §63(2) OF FINNISH COPYRIGHT ACT.

§63 Chapter 8. Applicability of the Act.

Territorial application (607/2015)

The provisions of this Act relating to copyright shall apply:

(2) to works first published in Finland or published in Finland within thirty days of having first been published in another country; 3) to a cinematographic work the producer of which has its headquarters or habitual residence in Finland;

## GERMAN ACT ON COPYRIGHT AND RELATED RIGHTS
### *Urheberrechtsgesetz* – UrhG translation by Ute Reusch

Section 7

Author

The author is the creator of the work.

Section 8

Joint authors

(1) Where several persons have jointly created a work without it being possible to separately exploit their individual shares in the work, they are joint authors of the work.

(2) The right of publication and of exploitation of the work accrues jointly to the joint authors; alterations to the work are permitted only with the joint authors' consent. However, a joint author may not refuse consent to publication, exploitation or alteration contrary to the principles of good faith. Each joint author

is entitled to assert claims arising from violations of the joint copyright; a joint author may, however, demand performance only to all the joint authors.

(3) Proceeds derived from the use of the work are due to the joint authors in accordance with the extent of their involvement in the creation of the work, unless otherwise agreed between the joint authors.

(4) Joint authors may each waive their share of the exploitation rights (section 15). They must make a declaration of waiver to the other joint authors. Upon such declaration being made their share accrues to the other joint authors.

Section 9

Authors of compound works

Where several authors have combined their works for the purpose of joint exploitation, each may require the consent of the others to the publication, exploitation or alteration of the compound works if the consent of the others may be reasonably expected in good faith.

Section 10

Presumption of authorship or ownership

(1) The person designated as the author in the usual manner on the copies of a released work or on the original of an artistic work is regarded as the author of the work in the absence of proof to the contrary; the same applies to any designation which is known to be a pseudonym or stage name of the author.

Section 11

General

Copyright protects the author in his or her intellectual and personal relationships to the work and in respect of the use of the work. It also serves to ensure equitable remuneration for the use of the work.

Section 13

Recognition of authorship

The author has the right to be identified as the author of the work. The author may determine whether the work is to bear a designation of authorship and which designation is to be used.

Section 14

Distortion of work

The author has the right to prohibit the distortion or any other derogatory treatment of his or her work which is capable of prejudicing the author's legitimate intellectual or personal interests in the work.

Section 15

General

(1) The author has the exclusive right to exploit his or her work in material form; this right in particular includes

1. the right of reproduction (section 16),

2. the right of distribution (section 17),

3. the right of exhibition (section 18).

(2) Further, the author has the exclusive right to communicate his or her work to the public in non-material form (right of communication to the public). The right of communication to the public in particular compromises

1. the right of recitation, performance and presentation (section 19),

2. the right of making the work available to the public (section 19a),

3. the right of broadcasting (section 20),

4. the right of communication by video or audio recordings (section 21),

5. the right of communication of broadcasts and of works made available to the public (section 22).

(3) The communication of a work is deemed public if it is intended for a plurality of members of the public. Anyone who is not connected by a personal relationship with the person exploiting the work or with the other persons to whom the work is made perceivable or made available in non-material form is deemed to be a member of the public.

Section 16

Right of reproduction

(1) 'Right of reproduction' means the right to produce copies of the work, whether on a temporary or on a permanent basis and regardless of by which means of procedure or in which quantity they are made.

(2) The transfer of the work to devices for the purposes of repeated communication of video and sound sequences (video and audio recordings), regardless of whether this is the recording of a communication of the work on a video or audio recording medium or the transfer of the work from one video or audio recording medium to another, also constitutes reproduction.

Section 17

Right of distribution

(1) 'Right of distribution' means the right to offer the original or copies of the work to the public or to put them into circulation.

Section 18

Right of exhibition

'Right of exhibition' means the right to display in public the original or the copies of an unpublished artistic work or an unpublished photographic work.

Section 19

Right of recitation, performance and presentation

(1) 'Right of recitation' means the right to give a public recital of a literary work by means of personal performance.

(2) 'Right of performance' means the right to give a public recital of a musical work by means of personal performance or to give a public theatrical performance of a work.

(3) The right of recitation and the right of performance include the right to make speeches and performances perceivable to the public by means of a screen, loud-speaker or similar technical devices outside of that room in which the personal performance is taking place.

(4) 'Right of presentation' means the right to make an artistic work, a photographic work, a cinematographic work or illustrations of a scientific or technical nature perceivable to the public by the use of technical devices. The right of presentation does not include the right to make the radio broadcast or the making available to the public of such works perceivable to the public (section 22).

Section 19a

Right of making works available to public

'Right of making works available to the public' means the right to make the work available to the public, either by wire or wireless means, in such a manner that members of the public may access it from a place and at a time individually chosen by them.

Section 20

Right of broadcasting

'Right of broadcasting' means the right to make a work available to the public by broadcasting, such as radio and television transmission, satellite transmission, cable transmission or by similar technical means.

## TELEVISION "THE TUNNEL"
## DISTRICT COURT OF MUNICH ZUM-RO2001/2

"The test is: would it be possible to exploit the contributions to the work independently of each other. If not, there is a work of joint authorship the copyright of which arises jointly in the co-authors, see Article 8(1) of the German Copyright Act. As a consequence, the ownership is held jointly by the co-owners. The joint property can only be transferred collectively."

"Thus unlike many other national copyright laws, according to German copyright law the authors of a script for a tv-film do not become joint authors of the tv-film- they are, just like the composer of the film music, authors of pre-existing works which are independent of the film work. Again, unlike U.S. law, German law does not know the work for hire doctrine according to which the initial ownership in the copyright of an audiovisual work may arise in the (legal)

person who employed the persons who created the work. The copyright arises always in the individual person(s) who created the work." (Arnold Vahrenwald Centrebar Munich. GERMANY • NEWS SECTION [2002] ENT.L.R http://vahrenwald.eu/wp-content/uploads/2017/01/117.DistCtMunich.19.01.01. TheTunnelJointAuthorshipAndTransferOfCopyright.2002.EntLR_.N2.pdf

PhD Arnold Vahrenwald is attorney at Law who deals specifically with energy law, film law, media law, copyright, patent law, advertising law, personal law, sports law, innovation, banking law, international private law, arbitration and out-of-court dispute resolution.

https://amradvisory.com/about-us/arnold-vahrenwald/

### COPYRIGHT LAW OF GERMANY ENCYCLOPEDIA, SCIENCE NEWS & RESEARCH REVIEWS

Transfer

Urhebergesetz is an author's right (droit d'auteur) or "monistic" style of law.

Therefore, special emphasis is placed on the relationship between the work and its actual author. This right is recognized as an aspect of the author's general moral rights and is therefore in principle non-transferable. This also means that there are no corporate copyrights in Germany and that fundamental rights cannot be transferred other than by inheritance ('legacy').

https://academic-accelerator.com/encyclopedia/copyright-law-of-germany