No. 25-7126

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

TREVOR KEVIN BAYLIS,

Plaintiff - Appellant,

v.

VALVE CORPORATION,

Defendants - Appellees.

_____

On Appeal from the United States District Court
for the Western District of Washington

_____

APPELLANT'S REPLY BRIEF

_____

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560
Tampere
FINLAND
+358 41 722 5899

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ..................................................... iii

STATEMENT REFERENCING ADDENDUM ...................................... 1

SUMMARY OF THE ARGUMENT ........................................... 1

ARGUMENT ..................................................................... 5

    I.    THE ANSWERING BRIEF CONCEDES THAT BAYLIS
    IS THE CREATOR OF THE WORK WHILST UNEMPLOYED,
    WHICH IS ITSELF ENOUGH FOR REVERSAL.    5

        A.    The Work Is Copyrightable Subject Matter And
        The Answering Brief Does Not Dispute That
        Baylis Created It Whilst Unemployed.    5

            1.    The Answering Brief Does Not Dispute That
            Under BCIA, Copyright Arises Automatically
            On Fixation Of A Work To That Work's
            Creator "Without Formality."    7

    II.    THE ANSWERING BRIEF IGNORES THAT IN ANY CASE
    THE SECOND FINNISH DECISION NEVER DETERMINED
    THAT BAYLIS DOES NOT OWN COPYRIGHTS IN IRON
    SKY OR IN ITS SCENES, MODELS AND ANIMATION.    8

        A.    The Answering Brief Recites Only Valve's
        Made-Up, Non-Existent Court Ruling Narrative
        That Contradicts The Evidence Of The Actual
        Operative Part Of The Second Finnish Ruling.    8

III. THE ANSWERING BRIEF FAILS TO ADDRESS THE LOWER COURT'S INABILITY TO GRANT COMITY TO A FOREIGN DECISION UNDER A FOREIGN LAW THAT PRECLUDES ITS OWN JURISDICTION OVER OR APPLICATION TO THE PERTINENT LEGAL ISSUE. 11

    A. The Answering Brief Does Not Demonstrate That The Finnish Market Court Had Any Power To Rule On Authorship Determinations Of The Work Based On The Finnish Copyright Act When That Act Jurisdictionally Precludes Itself From Determining Copyright Authorship Of A German Work. 11

        1. Contrary To The Answering Brief's Near Frivolous Grasping, Subject-Matter Jurisdiction Cannot Be Waived Or Forfeited By Consent Of The Parties And Can Be Raised At Any Time, Even On Appeal. 13

        2. Contrary To The Answering Brief Assertion That Baylis Did Not Address Elements of Comity, Baylis Specifically Argued Jurisdiction Issues In His Opposition To Valve's MSJ. 14

        3. Manifest injustice. 18

IV. THE ANSWERING BRIEF WRONGLY ELEVATES PRECATORY COMITY WHILE IGNORING MANDATORY U.S. TREATY IMPLEMENTING LAW LIKE THE BCIA. 21

    A. The BCIA Mandatorily Governs Choice-Of-Law For Determining The "Country Of Origin" And Copyright Protections In US Courts, Overcoming Any Comity Considerations. 21

        1. Misapplication of Standards. 23

CONCLUSION 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Central Virginia Community College v. Katz*

  546 U.S. 356 (2006) ................................ 8

*Balistreri v. Pacifica Police Dep't,*

  *901 F.2d 696 (9th Cir. 1990))* ........................... 19

*Feist Publications v. Rural Telephone Services, Co.,*

  499 U.S. 340 (1991) ................................ 6

*Glass Egg Digital Media v. Gameloft, Inc., No.17 - cv - 04165, 2018*

  WL 3659259 (N.D. Cal. Aug 2, 2018) ............................... 6

*Gonzalez v. Thaler,*

  565 U.S. 134 (2012) .......................... 20

*Haines v Kerner,*

  404 US 519 (1972) ................................ 19

*Hendricks & Lewis PLLC v Clinton,*

  766 F3d 991 (9th Cir. 2014) ............................ 20

*Hilton v. Guyot,*

  59 U.S. 113 (1895) ............................... 8

*Hopkins v Lee,*

  (1821), 6 Wheat 109, 19 U S 114 ......................... 8

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*

  153 F.3d 82 (2d Cir. 1998) ......................... 3, 17, 22

*Kaufmann v Kijakazi*,

    32 F4th 843 (9th Cir 2022)............................................................19, 20

*Kona Enters., Inc v Estate of Bishop*,

    229 F3d 877 (9th Cir. 2000) ..............................................................18

*McDowell v. Calderon,*

    197 F.3d 1253 (9th Cir.1999) ...........................................................19

*National Steel Corp. v Golden Eagle Ins.*

    Co., 121 F3d 496 (9th Cir 1997) .......................................................20

*Pennington v Gibson*,

    (1853), 16 How 65 U S 78 .....................................................................8

*Phillips v. Securitas Security Services USA, Inc.,*

    No. C 17-06693 WHA, 2018 WL 3474186,

    (N.D. Cal. July 19th 2008) ............................................................... 19

*S.O.S., Inc. v. Payday, Inc.,*

    886 F.2d 1081 (9th Cir. 1989) ...........................................................17

*Turner v. Burlington N. Santa Fe R. Co.,*

    338 F.3d 1058 (9th Cir. 2003) ................................................... 19, 20

*United States v. Cotton*,

    535 U.S. 625 (2002) ................................................................... 4, 20

**Constitutional Provisions and Statutes**

17 U.S.C. § 104 ....................................................................... 3, 4, 12, 18, 22

17 U.S.C. § 104(b)(2) ........................................................................ 4

17 U.S.C. §§ 401-405 ........................................................................ 2

U.S. Constitution Fifth Amendment ............................................... x

**Other Authorities**

*Baylis v Troll VFX*: L 15/3246821. 21 Oct. 2016 ...................................... 4, 6

Berne Convention Implementation Act of 1988,

Pub. L. 100-568 ................................ 1, 2, 3, 4, 7, 12, 17, 18, 21, 22, 23

Berne Convention for the Protection of Literary and Artistic Works

(Paris Act, 1971) ....... 1, 2, 3, 4, 7, 11, 12, 14, 15, 17, 18, 21, 22, 23, 24

*id* Article 3 ............................................................... 14, 13, 16

*id* Article 5 ............................................................... 16, 21

*id* Article 5(2) ............................................................ 16, 15

*id* Article 5(4)(a) .......................................................... 1, 7, 11, 12, 16

*id* Article 6bis ............................................................ 21, 22

Article 1 of Protocol 1 to the European Convention on Human Rights

(In, *Safarov v. Azerbaijan*) ................................................ 22

Finnish Copyright Act § 1 ........................................................... 10

Finnish Copyright Act § 2 ............................................................. 9

Finnish Copyright Act § 3 ............................................................. 9

Finnish Copyright Act § 63(2) ........................................... 10, 12, 16

German Act On Copyright And Related Rights

    (Urheberrechtsgesetz – UrhG translation by Ute Reusch) 3, 4, 9, 12, 14

MAO:302/18: *A, B, C, D and E v Blind Spot Pictures Oy and*

    *Iron Sky Universe Oy*: 2017/588. 31. May. 2018

    (Also, "second ruling") .......................................... 4, 6, 8, 9, 10, 12, 13

Response Of The Register Of Copyrights To Request

    Pursuant To 17 U.S.C. § 411(b)(2) .......................... 6, 7, 16, 18, 22, 24

Restatement (Fourth) Foreign Relations Law § 483 (2018) ........................ 13

U.K. Copyright Designs And Patents Act 1988 ...................................... 14, 15

U.S. Copyright Office Compendium (Third)

    Chapter 2000; 2002.2 ......................................................... 16

## STATEMENT REFERENCING ADDENDUM

Pertinent constitutional provisions, treaties, statutes, and other regulations or rules are set forth verbatim in the Addendum to this brief.

## SUMMARY OF THE ARGUMENT

The Answering Brief of Appellee Valve Corporation has failed to offer any substantive answers to Appellant Baylis' points I, II, and III raised in his Opening Brief.

The Answering Brief actually concedes point I, that Appellant Baylis is the creator of his 3D models, set designs, scenes and animations in *Iron Sky* (the "Work") and that Baylis <u>was unemployed</u> when he created the Work. Therefore, no "work for hire" contract or any other written contractual transfer of copyright away from Baylis could have occurred. This admission of a factual dispute, let alone Valve's concession that Baylis's contention is factually correct, by itself mandates this Court's reversal of the lower court's summary judgment grant under the undisputed law that copyright in the Work arose <u>automatically</u> to Baylis upon his creation and fixation of his Work, without the need for any further formalities.

Appellee Valve Corporation are not telling the whole story and are attempting to use the discretionary, courtesy-based or "precatory" framework of comity to bypass the "mandatory", treaty-based requirements of the Berne Convention Implementation Act of 1988, Pub. L. 100-568 ("BCIA") and U.S. copyright law.

The Answering Brief mischaracterizes the work as a Finnish film but that just relates to the place where the idea sprung from (A Finnish Sauna) not the "country of origin" of the final fixed copyrighted Work under Berne Convention Article 5(4)(a).

Beyond the reversible factual dispute, it makes no sense, and indeed no difference, to extend precatory comity to a Finnish decision when Finland's law contains the same automatic conferring of copyright protection upon creation and fixation of the Work with no requirement of any further formalities. Both countries' copyright rules are based on Berne Convention principles, which were implemented in mandatory United States law through the BCIA, implemented in 17 U.S.C. §§ 401-405.

To put it another way, applying comity is a barred formality to determine a foreign work's authorship when it violates the mandatory statutory command of "automatic protection" dictating that copyright subsistence and ownership in a Berne Convention signatory country cannot be conditioned upon formalities like registration, court rulings or copyright notice, since the Berne Convention as implemented in U.S. statutory law prohibits member states like the U.S. from imposing formalities on foreign authors that would hinder their ability to claim ownership or enforce rights.

Under U. S. law, copyright disputes involving foreign works are determined by the principles of *lex loci protectionis* (the law of the country where protection is sought) to determine the scope of protection of such rights and infringement. Accordingly, there are only three issues to be considered, and considered under U.S. law: 1) Authorship, which automatically belongs to the natural person who creates and fixes the work; 2) any transfer of ownership rights from the author; 3) the existence of copying, which establishes an infringement of the owner's exclusive rights.

Given there is no written transfer of ownership of copyright away from Baylis on record, the salient first of these issues, which is the issue in this appeal, authorship of a foreign work, requires a choice-of law analysis in which U. S.

courts look to the law of the country of origin of the work (*lex originis*). This was conclusively established in *Itar-Tass Russian News Agency v. Russian Kurier, Inc*., 153 F.3d 82, 90 (2d Cir. 1998), where the Second Circuit ruled that while United States law exclusively governs protection of the work, at the same time authorship issues, and therefore initial ownership of the work, must be decided by the law of the country of origin.

Under the BCIA and the copyright statute on national origin, 17 U.S.C. § 104, the country of origin is generally the nation where the work was first published. Beyond this though, the Answering Brief concedes as a factual matter that Baylis created the Work <u>whilst unemployed</u>, without written contractual transfer of ownership, and there is sufficient evidence on the record to establish a *prima facie* case of copyright ownership and authorship, making this case more appropriate for partial or full summary judgment in Baylis's favor, rather than Valve's favor.

It is undisputed that the Work *Iron Sky* at issue in this case was first published on the 11th of February 2012 in Germany as demonstrated by the evidence on the record. 2-SER-43 - 57, 2-SER-71 - 75, 3-SER-384 at ¶ 32, 3-SER-385 at ¶ 33, 34. No other publication of the Work occurred previously nor in any other country until more than 30 days later (2-SER-052 "Iron Sky will open in Finland in April."). Therefore, Germany, another Berne Convention member country, is the country of origin of the Work under the BCIA and 17 U.S.C. § 104.

It follows that if there is still any dispute over authorship, the lower court materially erred in failing to conduct a proper choice-of-law analysis to determine initial ownership questions in this case based on German law as

required under the BCIA and 17 U.S.C. § 104, the correct and mandatory legal standards, not the precatory formality of comity.

Notably, the factual issue of "who is the author of the Work" was factually resolved in favor of Baylis in a previous, "first" Finnish case, *Baylis v Troll VFX*: L 15/3246821 - 21 Oct 2016, which is in the lower court's record. Had Appellee not diverted the lower court from the BCIA and proper choice-of-law analysis, this would have led to the lower court's application of the law of Germany as country of origin for copyright authorship and ownership issues, and not to the "second" Finnish ruling, since Finland is not the country of origin of the Work. *See* 17 U.S.C. 104(b)(2).

Beyond this, the Answering Brief has no response to the independently reinforcing point that the second Finnish ruling also happens to lack subject matter jurisdiction *ab initio* under Finnish law to determine initial authorship issues of the Work because Finland is not the country of origin of the Work. The Answering Brief's claim that subject matter jurisdiction can be waived is just wrong and borders on being frivolous. The case of *United States v. Cotton*, 535 U.S. 625, 630 (2002), is just one example from the U.S. Supreme Court of the well-known maxim that subject matter jurisdiction is never waivable and can be raised at any stage of litigation or appeal.

In sum, the Answering Brief's concession that Baylis is the creator of the Work fixed in a tangible medium whilst unemployed, and the lower court's failure to perform the appropriate, and rigorous, choice-of-law analysis under the correct governing law, which is the BCIA, and then apply the correct country's law's for questions of initial ownership (authorship) exclusively under United States law's implementation of the Berne Convention is reversible error.

## ARGUMENT

### I. THE ANSWERING BRIEF CONCEDES THAT BAYLIS IS THE CREATOR OF THE WORK WHILST UNEMPLOYED, WHICH IS ITSELF ENOUGH FOR REVERSAL.

#### A. The Work Is Copyrightable Subject Matter And The Answering Brief Does Not Dispute That Baylis Created It Whilst Unemployed.

Baylis is genuinely the author of his own Work, supported by the evidence of his creation and fixation of that Work (Generally, 4-SER-675 - 692, 4-SER-640, 3-SER-574 - 612, 3-SER-382 to 384). Valve does not even dispute this; the Answering Brief actually concedes that Baylis is the creator of the Work at issue and that he was unemployed when he created it and fixed it in a tangible medium of expression (saved to a hard drive). (Ans. Br. at 7-8.) While arguably this is a judicial admission in Baylis's favor, more to the point for present purposes it absolutely establishes at least a factual dispute supported by the record evidence.

This concession alone should indicate to this Court that it should reverse the lower court's ruling because copyright arises automatically on fixation of the Work and it was not possible for Baylis as an unemployed person to have been deprived of his lawfully acquired copyrights; there is no U.S. style "work for hire" doctrine in either Germany or Finland for the type of work at issue, and there is no evidence in the record that Baylis ever signed away any ownership of those copyrights to any third party.

Valve's concession alone from the Answering Brief should cause this Court to reverse the lower court's grant of summary judgment. Valve does not argue against the existence of evidence in the record where Baylis gives video demonstrations of the Work, themselves copyrightable works authored by Baylis,

nor that his name is in the meta data of the 3D files at issue. (Generally, 4-SER-675 - 692, 4-SER-640, 3-SER-574 - 612, 3-SER-382 to 384). Nor does Valve argue against Baylis being confirmed author of the Work in the First Finnish ruling, *Baylis v Troll VFX*. 3-SER-585.

The U.S. Supreme Court confirms the creator of a work fixed in a tangible medium of expression is the copyright owner: "[T]he author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 737 (1989).

The Answering Brief also ignores that in this case the United States Copyright Office ("USCO") specifically investigated Baylis' U.S. Copyright registration which included supporting evidence of Baylis' name in the metadata of the Work and other proofs such as newly rendered images which are also fixed in a tangible medium of expression, and reference to *Baylis v Troll VFX* wherein he was confirmed as the author, 3-SER-585, and the USCO correctly found it to be a copyrighted Work and that as a joint author Baylis was entitled to name himself as the copyright claimant regardless of any other formality such as a foreign ruling. 3-SER-546. This easily exceeds the very low bar for copyright to arise. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 US 340, 345 (1991); *Glass Egg Dig. Media v. Gameloft*, No 17-cv-04165, 2018 WL 3659259, at *2-*3 (N.D. Cal Aug. 2, 2018).

1. **The Answering Brief Does Not Dispute That Under BCIA, Copyright Arises Automatically On Fixation Of A Work To That Work's Creator "Without Formality."**

It does not make any logical sense to attempt to apply the precatory, non-biding formality of comity to the laws of another Berne Convention member state nation as an attempt at some sort of misguided, back-door loophole to unlawfully avoid the "automatic protection and no formalities" rule of both the U.S. and that other member state nation, and that is already implemented in the mandatory U.S. federal statutes in the form of the BCIA, especially when that member state nation (Finland) is not even the country of origin of the Work under Berne Convention Article 5(4)(a).

The lower court was offered specific guidance by the USCO about the issue at hand, that U.S. law is the exclusive source of protection for the Work regardless of other nations' laws or rulings. The Answering Brief does not and cannot justify the lower court ignoring the very guidance it sought from the USCO, circumventing the mandatory federal law of the BCIA, and instead giving deference to a Finnish court decision under precatory comity. Thus, usurps United States law's exclusive application of copyright protection to foreign Works under BCIA which are automatically protected without the barred formality of comity applying.

II.   **THE ANSWERING BRIEF IGNORES THAT IN ANY CASE THE SECOND FINNISH DECISION NEVER DETERMINED THAT BAYLIS DOES NOT OWN COPYRIGHTS IN IRON SKY OR IN ITS MODELS AND ANIMATION.**

A.   **The Answering Brief Recites Only Valve's Made-Up, Non-Existent Court Ruling Narrative That Contradicts The Evidence Of The Actual Operative Part Of The Second Finnish Ruling.**

It is a well-known staple of civil law rulings in civil law nations such as Finland, just as it is in U.S. rulings, that the *obiter dicta* of a civil court ruling is not binding in any future cases. It is only the operative part (*Dispositif*) that has binding effect. In terms of U.S. law, in *Central Virginia Community College v. Katz,* 546 U.S. 356, 363 (2006), the Supreme Court affirmed that statements not essential to the outcome are not precedential (i.e., not binding); therefore they do not invoke *stare decisis*. In the context of recognizing foreign judgments, e.g., *Hilton v. Guyot* 159 U.S. 113 (1895), the focus is on the final, conclusive *ratio decidendi* of the foreign court. Any incidental remarks (*dicta*) made by foreign courts are generally disregarded, as only the final adjudication on the merits is considered:

> The obiter dictum of Mr. Justice Livingston in *Hopkins v Lee* (1821), 6 Wheat 109, 19 U S 114, repeated by Mr. Justice Daniel in *Pennington v Gibson* (1853), 16 How 65, 57 U S 78, as to the general effect of foreign judgments, has no important bearing upon the case before us.

*Id. at 183.*

Beyond this baseline, the Answering Brief's attempted reliance on the non binding *obiter dicta* of the Market Court ruling MAO302/18 is highly misleading because Valve simply made up a final ruling that does not actually exist. Contrary to Valve's assertion that the Finnish Market Court ruled Baylis is not the copyright owner of the film or any of its 3D animated scenes or models, the actual operative

part of that ruling abandoned the question of authorship and only ruled on the written

contract-transferable rights under Section 2 of the Finnish Copyright Act, 4-SER-710;

3-SER-413, and according to the ruling's detail, this means the ruling relates only to

the "Japanese ship." 4-SER707, ¶¶ 86-87. The "Japanese ship" was the only work the

Market Court actually confirmed as authored by anyone, which was Sebastian Barquin

("Barquin") as author, identified in the Market Court Judgment as "A" and therefore,

the Japanese ship was the only work that could have written, contract-transferable rights

which in any case were specifically limited in relation to Barquin's freelancer contract

under Section 2 of the Finnish Copyright Act. 4-SER707, ¶¶ 87-88. No other contracts,

such as "training contracts," were examined.

Baylis specifically pointed this limitation out in his Opening Brief at 29-30[1] and

on the record, e.g. 3-SER-343, but the Answering Brief makes no substantive argument

against this salient fact. The Answering Brief also makes no mention that authorship

rights (Section 3 of the Finnish Copyright Act) were not considered in the operative

part of the ruling and therefore, Baylis' status as a "Joint Author" remains governed by

German law and has not been invalidated by the Second Finnish ruling at all.

Baylis' own counsel Petri Eskola, who Valve concede is a specialist

Intellectual Property expert (3-SER-436, ¶ 13), conveyed to Baylis that the Market

Court's "lack of confirmation" of authorship was not a denial of authorship but

would lead to an "orphan works" status of the Work, and not a lack of copyright.

Op. Br., at 27. Indeed, the *obiter dicta* admits that the action does not even

---

[1] Baylis refers to his own page numbers.

concern authorship rights (Moral Rights). 4-SER-707, ¶ 86. The Answering Brief makes no substantive argument against this salient fact, either.

Section 1 of the Finnish copyright act, which acts as the "gatekeeper" of Finnish copyright, establishing the threshold for what constitutes a "work," is conspicuous by its absence from the Second Finnish Ruling, even in its *obiter dicta*. This absence conclusively demonstrates the Finnish Market Court realized it did not have subject matter jurisdiction to rule on authorship rights due to the § 63(2) territoriality restriction of that very same Finnish copyright act as a jurisdictional filter, 3-SER-429 - 433, which prevents that court from applying Section 1 to works not first published in Finland. <u>The Work at issue in this case was not first published in Finland, as supported by the evidence in the record.</u> 2-SER-43 - 57, 2-SER-71 - 75, 3-SER-384 at ¶ 32, 3-SER-385 at ¶ 33, 34. The Answering Brief makes no mention of or response to any of this. The Finnish Market Court was legally prohibited from using Section 1 to "strip" authorship in a non-Finnish work from a non-Finnish contributor. The court's silence on Section 1 in the operative part, 4-SER-710 (Summary of judgment), is not an oversight; it is a mandatory statutory compliance under § 63(2), and the operative part does not contain a declaratory judgment stripping Baylis of his status as a joint author of the Work.

Accordingly, Baylis was not actually deprived by the Second Finnish Ruling of his right to claim authorship of the Work in future cases, nor of any copyright ownership by written contract. Valve simply fabricated a hyper-broad ruling narrative as a strawman attack within its own circular reasoning fallacy, then used this to mislead the lower court into applying comity to a non-existent ruling. However, while Valve wrongly misled the lower court into thinking *all* copyright in the Work was denied by

the Second Finnish Ruling, it remained incumbent upon the lower court to see beyond that misdirection and determine the proper scope and limitation of that ruling, as Baylis advocated below. The lower court's failure to do so is reversible error.

### III. THE ANSWERING BRIEF FAILS TO ADDRESS THE LOWER COURT'S INABILITY TO GRANT COMITY TO A FOREIGN DECISION UNDER A FOREIGN LAW THAT PRECLUDES ITS OWN JURISDICTION OVER OR APPLICATION TO THE PERTINENT LEGAL ISSUE.

#### A. The Answering Brief Does Not Demonstrate That The Finnish Market Court Had Any Power To Rule On Authorship Determinations Of The Work Based On The Finnish Copyright Act When That Act Jurisdictionally Precludes Itself From Determining Copyright Authorship Of A German Work.

The Answering Brief tries to argue that Baylis has not addressed the comity and collateral estoppel issues, but this is utterly false. In addition to the Opening Brief detailing the reasons why comity would fail in any event, more importantly, the Opening Brief argues that comity is the wrong legal doctrine to apply in this case and therefore collateral estoppel cannot be reached. (Op. Br. at 36.)

The Opening Brief persuasively argues that comity cannot apply, among other reasons because the Finnish Market Court lacked subject matter jurisdiction to apply Finnish law to the issue of initial authorship of the Work. Baylis made this point very early on in proceedings below, long before Valve's MSJ, and Baylis made clear that the Second Ruling suffered from a grave procedural error in that it had applied the wrong country's laws. 4-SER-655. Indeed, Baylis brought up comity before Valve ever did, arguing that U.S. courts are not obligated to recognize judgments rendered by a foreign state. 4-SER-664.

The record below contains evidence that Finland is not the "country of origin" of the Work under Berne Convention Article 5(4)(a), but rather Germany is, and it makes no logical sense (besides being *ultra vires*) to determine authorship questions of a German work based on applying comity to the Finnish Copyright Act when the Work is *not* a Finnish work under Berne Convention Article 5(4)(a).

The Opening Brief fully and convincingly argues that Finnish courts lack subject matter jurisdiction to determine initial authorship issues of a German work, by automatically applying the Finnish Copyright Act to a German work, due to the jurisdictional territoriality restrictions under section 63(2) of that very same Finnish Copyright Act. The determination of initial authorship (who created the Work, and thus owns the copyright initially) is governed by the law of the "country of origin" of the Work (e.g., German law for a work first published in Germany), under Berne Convention Article 5(4)(a) which, is in turn implemented in the U.S. federal statutory law by the BCIA and 17 U.S.C. § 104. None of this is treated in the Answering Brief.

The Answering Brief cannot reach its collateral estoppel arguments based on the Second Finnish Ruling that invokes the Finnish Copyright Act to determine initial authorship of works outside its jurisdiction. Since the Finnish court lacked the legal competence to determine authorship of the Work under the substantive law of the country where the Work was first published (Germany), that court's findings regarding that authorship do not constitute a valid basis for precluding future litigation on the same subject. Put another way, the Finnish court's ruling based on a misapplication  of the Finnish Copyright Act to a foreign (German) work cannot create a binding precedent for collateral estoppel purposes because its

judgment issued without proper subject matter jurisdiction is considered null and void *ab initio*, as if that judgment never happened. The Answering Brief makes no valid substantive argument against this salient point.

This Court may accept the Answering Brief's silence on jurisdiction as Valve's concession for reversal, because if a work was first published in Germany, Finnish law cannot in any way apply to determine initial ownership or authorship of that work.[2] This is a failure of factor (2) of the *Hilton* test, "having both personal and subject-matter jurisdiction."[3] The Finnish Market Court's lack of subject matter jurisdiction, which jurisdiction Valve and the lower court both implicitly relied upon, is ample reason for the failure of comity and collateral estoppel, rooted in a legal error deserving reversal.

> **1.  Contrary To The Answering Brief's Near Frivolous Grasping, Subject-Matter Jurisdiction Cannot Be Waived Or Forfeited By Consent Of The Parties And Can Be Raised At Any Time, Even On Appeal.**

The Answering Brief's contention that the Finnish Market Court's lack of subject matter jurisdiction to adjudicate a German work's authorship was raised by Baylis "too late" misapprehends that a court lacking jurisdictional authority over a particular issue (such as foreign works authorship) cannot legally pass judgment on it, regardless of the timing of raising the issue. A ruling lacking

---

[2] The Finnish Market Court is a fine specialized court dealing with intellectual property rights, but it still lacks the authority to adjudicate issues that fall outside its scope, such as foreign copyright authorship determinations where no link to Finnish jurisdiction exists.

[3] RESTATEMENT (FOURTH) FOREIGN RELATIONS LAW § 483 (2018) ("[a] court in the United States will not recognize a judgment of a court of a foreign state if ... the court that rendered the judgment did not have personal or subject-matter jurisdiction").

subject matter jurisdiction is null and void *ab initio*, meaning Valve misled the court below into the peculiar situation of applying comity to a Finnish ruling that could never have had any legal effect to begin with.

Baylis repeatedly made the lower court aware that the Finnish Market Court applied the wrong jurisdiction's law. Valve's specious complaint is now that Baylis did not use the actual word "jurisdiction" in earlier arguments; however, Germany is a sovereign jurisdiction with a comprehensive legal system and Baylis certainly made clear that German law should have applied even as it still does apply! 4-SER-655, 3-SER-403. Germany is right now, today, the jurisdiction for questions of copyright subject matter accruing to Baylis for his Work. Not Finland!

> **2.** **Contrary To The Answering Brief Assertion That Baylis Did Not Address Elements of Comity, Baylis Specifically Argued Jurisdiction Issues In His Opposition To Valve's MSJ.**

The Answering Brief asserts the Finnish Market Court has subject matter jurisdiction over intellectual property rights matters (such as copyrights) and nationwide geographical jurisdiction but this misapprehends that under Berne Convention Article 3, the "point of attachment" of copyright to an author, Baylis in this case, for an unpublished work is based on Baylis' nationality not habitual residence[4], because Baylis is a UK national and his copyright subject matter for unpublished works initially arises under the UK Copyright, Designs and

---

[4] *Baylis has never been bound by Finnish copyright law and is not bound by it today*. The Habitual residence criteria According to Article 3 of the Berne Convention relates to authors who are not nationals of a member country but have their "habitual residence" in one and are treated as nationals of that country for the purposes of copyright protection.

Patents Act 1988 (CDPA) from the moment of fixation and not The Finnish

Copyright Act. This connection of the CDPA to Baylis, attaches his authorship to

his work even if it is created outside the UK (e.g., on a plane or in international

waters), because Baylis, as a UK national and author of his own work, qualifies

under Berne Convention national treatment provisions.

Then under Berne Convention Article 5(4)(a) the nation of "first publication,"

(Germany) overrides Baylis' nationality for authorship and initial copyright

ownership of the published Work at issue in this case (*lex originis*), 3-SER-328,

which means that Finnish copyright law has never applied to Baylis in terms of  *any*

Berne Convention "point of attachment" or "country of origin" criteria.

 The protection of Baylis' Work is separate to authorship and based on principles

of Berne Convention Article 5(2) (*lex loci protectionis)* national treatment provisions.

Therefore, the Finnish Market Court should have determined the extent of protection

of the Work *in Finland only* under it's own nationwide geographical jurisdiction as the

Answering Brief asserts. Ans. Br., at 9.  However, the Market Court cannot not "usurp"

or contradict the foundational status of the "automatic protection" principles of the

Work under the Berne Convention Article 5(2) because Baylis' works are still protected

works in the UK (unemployed/unpublished) and Germany (first published) even to this

day under Berne Convention Article 3 "point of attachment" and "country of origin"

Article 5(4)(a) criteria. See Op. Br., at 30-31; 3-SER-410 n. 7; 3-SER-328.

Under Berne Convention rules, Finnish courts, including the Market

Court, as well as United States courts, must provide foreign works with the same

protection as domestic works (national treatment). This is this same principle

that the lower court itself should have adopted and which Baylis specifically

explained to the lower court throughout his Opposition to Valve's MSJ. *See generally* 3-SER-402 - 428; *Specifically* 3-SER-411 - 412.

It is therefore disingenuous for the Answering Brief to assert that Baylis subject matter jurisdiction arguments are waived or that Baylis did not address elements of comity because Baylis genuinely made these salient and pertinent arguments extensively in his Opposition to Valve's MSJ. For example,

> MAO302/18 includes a "grave procedural error" in that the Work in question was "First published" in Germany, and therefore, Finnish Copyright law was from precluded from applying in that very case in terms of "point of attachment" of copyright based on "country of origin" rules (See Berne Convention articles 3-5) and thus precluded under Finland's own Copyright Act ("FCA") due to territoriality restrictions under the FCA section 63(2). Also see Plaintiff's Notice Of Objection On Defendant Valve Corporation's Notice Of Intent To Raise Foreign Law. Dkt. 79. Which Baylis incorporates by reference here Additionally, Baylis can establish copyright ownership in Iron Sky and its 3D models and animated scenes ("Work") because there is no dispute from Valve or anyone else that Baylis is not the creator and originator of that Work, thus logically, the author of the Work jointly with others.

3-SER-403 – 404; 3-SER-403 n. 1.

Furthermore, Baylis also addressed the fact that protection for his Work is exclusively based on United States law by the "comity" of implementing Berne Convention rules.[5] 3-SER-406. Additionally, Baylis addressed the fact that the USCO had themselves guided the lower court to the fact that protection of his Work is exclusively based on United States law including guiding the lower court to U.S. COPYRIGHT OFFICE COMPENDIUM (THIRD) § 2002.2 ("U.S. law applies whenever a United States work or a foreign work is involved in a

---

[5] Baylis' minor error back then was to not press his point *strongly enough*: Attachment of U.S. law is not by precatory comity but buy mandatory statutory command of the BCIA.

copyright infringement lawsuit in this country."). Furthermore, factual questions of authorship are not fit to be addressed by comity in any case. "Authorship is a question of fact." (*S.O.S., Inc. v. Payday, Inc*, 866 F.2d 1081,1086 (9th Cir. 1989). 3-SER-407.

Baylis made a further extensive argument in his Opposition to Valve's MSJ as to why Finnish law could not apply to issue of authorship of the Work including reference to others who are joint authors, Kelly Myers (U.S. nationality) and Sebastian Barquin (UK nationality). And the fact that the Finnish court did not even provide protection to the Work at all as mandated under Berne Convention national treatment provisions. 3-SER-410; 3-SER-410 n. 7, 8.

Valve knew previously about Baylis' jurisdiction argument, "Valve anticipates Baylis will make a red herring argument that German law should apply..." 3-SER-532. Valve even attempted to counter Baylis' Berne Convention Article 3-5 "point of attachment" and "country of origin" arguments in their MSJ by asserting that "choice of law does not matter to the outcome here." 3-SER-532. Then somewhat ironically citing *Itar-Tass* themselves in contradiction to their own assertion about choice of law not mattering(?) 3-SER-532. This indicates that Valve knew all along that the Berne Convention was the correct source of law to apply under BCIA, and not comity. Valve would have know themselves that in *Itar-Tass* the United States Court of Appeals for the Second Circuit sought guidance from the Berne Convention to determine the "country of origin" of the works in question. Specifically the national treatment principle and the definition of country of origin to guide its conflict-of-laws analysis. *See Itar-Tass*, 153 F.3d at 89-91.

It is disingenuous for the Answering Brief to assert that Baylis waived any subject matter jurisdiction argument when it has always been, and still is the case, that Finland has no authority to rule on initial authorship issues for a German work (i.e. a lack of subject matter jurisdiction for authorship issues related to the Work).

Valve simply called Baylis' previous jurisdiction arguments a "red herring," 3-SER-532, and deliberately misdirected the lower court away from such jurisdiction arguments, which still remain now as the most salient arguments because they relate to the Berne Convention national treatment provisions. Protection for Baylis Work is enforced exclusively under United States laws, BCIA and 17 U.S.C. § 104, which the USCO had already directed the lower court toward, based on the lower court's own request. 3-SER-538 - 546.

### 3. Manifest injustice.

Valve does not seriously argue that Baylis's argument does not prevail or that it was not presented in full to the lower court using evidence in the lower court's record, only that it was presented too late. Valve hopes to derail the substantive merits of Baylis's winning arguments based on what amounts to not much more than a procedural technicality.

"[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, *committed clear error*, or if there is an intervening change in the controlling law." *Kona Enters., Inc v Estate of Bishop*, 229 F3d 877, 890 (9th Cir. 2000) (internal quotation omitted; emphasis added). The Opening Brief's argument is not just some revisiting of a lower court's discretion; the lower court's ignoring of

the fatal defect in the subject matter jurisdiction of the null and void *ab initio* relied-upon foreign ruling amounts to clear error.

More importantly, the courts of this Circuit are still allowed to make some extra procedural room to do the right thing:

> A district court has considerable discretion when considering a motion to amend a judgment under Rule 59(e). *McDowell v. Calderon*, 197 F.3d 1253, 1254 n. 1 (9th Cir.1999) (quoting 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2d ed.1995)). There are four grounds upon which a Rule 59(e) motion may be granted: 1) the motion is "*necessary to correct manifest errors of law or fact upon which the judgment is based*;" 2) the moving party presents "newly discovered or previously unavailable evidence;" 3) the motion is necessary to "*prevent manifest injustice*;" or 4) there is an "intervening change in controlling law." Id.

*Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (first emphasis in original, second emphasis added).

Baylis losing all his legal rights due to a flawed comity analysis that was based on a foreign ruling lacking subject matter jurisdiction, simply because Baylis, who is a diagnosed dyslexic, 3-SER-321, and a *pro se* litigant[6], could not find the right words to fully explain the evidence before the lower court fast enough, would indeed be a manifest injustice.

---

[6] Baylis understands that pro se litigants are generally held to similar standards as represented litigants. *But see, e.g., Haines v Kerner,* 404 US 519, 520, 92 S Ct 594, 596 (1972) (*pro se* pleadings held to less stringent standards than formal pleadings drafted by lawyers), and its progeny. *See also, Phillips v. Securitas Sec. Servs. USA, Inc.*, No. C 17-06693 WHA, 2018 WL 3474186, at *2 (N.D. Cal. July 19, 2018) ("[t]o ensure that *pro se* litigants do not lose their right to a hearing on the merits because of a technical procedural requirement, we construe *pro se* pleadings liberally" (*citing Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). Baylis submits at any rate that this Panel just might extend procedural leeway as well to counsel who raised a breakthrough argument in the case involving another court's subject matter jurisdiction but did so just a little late.

Importantly, the "extra procedural room" is still available in this Circuit today. *See Kaufmann v Kijakazi*, 32 F4th 843, 851 (9th Cir 2022) (commended lower court for expanding upon receiving a Rule 59 motion its review of submitted evidence and reversing earlier ruling that was clear error; also upheld lower court's "considerable discretion" to do so).

The Answering Brief's cases of *National Steel Corp. v Golden Eagle Ins. Co.*, 121 F3d 496, 500 (9th Cir 1997), and *Hendricks & Lewis PLLC v Clinton*, 766 F3d 991, 998 (9th Cir. 2014), cited for the proposition that arguments on a "motion for reconsideration" come too late for appeal purposes, do not answer Baylis's arguments about the operation and scope of relief under Rule 59. First, those cited cases, and all the cases they in turn cite, all refer literally only to a "motion for reconsideration" and none of them state that the motion coming later was a Rule 59 motion; perhaps the rule they recite applies only to literal "motions for reconsideration" and not to the final review steps for judgments that are formally sanctioned under Rule 59. Further, those cited cases do not and cannot establish any "exception to the exceptions" of Rule 59 that are noted in *Turner*, 338 F3d at 1063, and acted upon in *Kaufmann*, 32 F4th at 851, nor do Appellee's cited cases set forth any unalterable bright-line rule for argument timing that neuters Rule 59.

The Answering Brief also erroneously claims that subject matter jurisdiction can be waived, which is a legally frivolous argument lacking any reasonable basis in law. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *Cotton*, 535 U.S. at 630 (subject matter jurisdiction is never waivable and can be raised at any stage of litigation).

**IV. THE ANSWERING BRIEF WRONGLY ELEVATES PRECATORY COMITY WHILE IGNORING MANDATORY U.S. TREATY IMPLEMENTING LAW LIKE THE BCIA.**

**A. The BCIA Mandatorily Governs Choice-Of-Law For Determining The "Country Of Origin" And Copyright Protections In US Courts, Overcoming Any Comity Considerations.**

The Berne Convention's national treatment principle contained in Article 5 whereby foreigners should be given the same protections as nationals, states:

> (1) Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

Berne Convention Article 5.

A federal court cannot simply ignore controlling statutory or constitutional legal standards in favor of comity. The lower court's ruling does not even contain the words "Berne Convention" in its ruling, which itself is rather demonstrative of the lower court's failure to recognize its own obligations towards the Berne Convention under the controlling federal statutory law of the BCIA. Nor are the words "Berne Convention" mentioned in the lower court's Rule 59 orders (3-SER-349 - 351; 1-SER-2 - 4; 2-SER-28 - 30), in stark contrast to Baylis' consistent mention of the Berne Convention throughout his submitted papers to the lower court, and in particular its Article 6bis regarding "the right to claim authorship." (e.g. 4-SER-665; DR 53[7] at 1; 3-SER-413; DR 97[8] at 13: 1-4; 3-SER-322.)

---

[7,8] These references are missing from Valve's excerpts of the record. Baylis refers to his own reference instead to DR 53, and DR 97.

Also missing from the lower court's rulings are other salient words linked to the basics of copyright protection under the Berne Convention and BCIA such as "Nationality," "point of attachment," "country of origin," and "first publication" and these absences similarly indicate analytical failure by the court below.

A reasonable fact finder could find that the Work in question is indisputably a Berne Convention Work, "first published" in Germany, 2-SER-43 - 57, 2-SER-71 - 75, 3-SER-384 at ¶ 32, 3-SER-385 at ¶ 33, 34, which sets the "point of attachment" of copyright subject matter to the Work based on German copyright law, not Finnish law. *See Itar-Tass*, 153 F.3d at 90. As the United States is a Berne Convention member state, under the BCIA Baylis should have protection afforded to him based on the principles of national treatment of Berne Convention rules pursuant to 17 U.S.C. § 104, as highlighted by the USCO's findings. 3-SER-542 n.18.

The fact that the lower court ignores the salient material fact that Baylis always has the right to claim authorship of his Work under Berne Convention Article 6bis and that the lower court does not even mention the Berne Convention in its rulings, 1-SER-5 - 13; 3-SER-349 - 351; 1-SER-2 - 4; 2-SER-28 - 30, should be materially concerning to this Court, because if the lower court had paid attention to the fact that Baylis always has the right to claim authorship, a basic human right under Protocol 1, Article 1 of the European Convention on Human Rights – "Right to peaceful enjoyment of property," then the lower court should have, and would have seen that Valve's comity defense was clearly, fundamentally flawed and not even the governing legal standard.

### 1.     Misapplication of Standards.

The Answering Brief is silent on the Opening Brief's contention that the lower court conflates choice-of-law analysis (under BCIA) with comity (Opening Brief at 36-38), and it inappropriately uses the discretionary doctrine of comity to bypass mandatory copyright protections under international treaty obligations such as the Berne Convention.

By the lower court applying international comity to defer to a foreign ruling that itself disregards copyright (or denies its existence) operates as an "illegal formality." It forces a work, that is automatically protected under the United States BCIA which allows enforcement of treaty law under United States law, to bypass that protection based on a discretionary, non-mandatory doctrine.

The Work at issue is high-value, registered, and Berne Convention protected Work. The failure of the lower court to apply protection to Baylis' Work is a violation of U.S. forum policy, which encourages the protection of valuable copyrighted works such as film works.

The lower court had its own *sua sponte* obligation to apply the BCIA, which requires the US to treat foreign works from Berne member states with the same standard as domestic works. Using comity to ignore these treaty obligations is legally flawed because comity is intended to be a "layer on top of" international law, not a mechanism to bypass copyright protection for foreign works.

### CONCLUSION.

The Answering Brief concedes Baylis created the Work whilst unemployed which means there could not have been any written contractual transfer of ownership of copyright. That is of itself reason enough to reverse. Copyright was

conferred on Baylis automatically upon creation and fixation of his Work, without the need for any further formality. Baylis's author's rights are inalienable.

Comity is the wrong legal standard to apply in this case. The United States' Berne Convention Implementation Act of 1988 is the correct, mandatory statutory standard, and applying it would confirm copyright belonged to Baylis automatically upon creation and fixation of his Work. Comity is simply a precatory, obviated formality barred by Berne Convention rules as implemented in the United States under BCIA, and there is no collateral estoppel present here.

For all the foregoing reasons and the reasons in the Opening Brief, none of which were overcome or even challenged by the Answering Brief, the judgment of the district court should be reversed, and the case remanded with direction to the lower court to bring the guidance of the USCO and all the other evidence in the record to the fact finder for determination of all factual issues, including Baylis' ownership and authorship in the Work, the application of Baylis' copyright, Valve's copying and infringement, and damages.

DATED this 11th day of March, 2026.
Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560 Tampere FINLAND
+358 41 722 5899

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Certificate of Compliance for Briefs

Case Number: 25-7126

I am a self-represented party.

This brief complies with FRAP 32(a)(7)(B)(i) and contains 6854 words, excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 11th day of March, 2026.

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560 Tampere FINLAND
+358 41 722 5899

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Certificate of Service for Electronic Filing

Case Number: 25-7126

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the Ninth Circuit using the Appellate Electronic Filing system.

Jeremy E Roller: jroller@aretelaw.com,

Jonah O. Harrison: jharrison@aretelaw.com,

jfischer@aretelaw.com,

kgreenberg@aretelaw.com

Arete Law Group, 600 University Street, Suite 2420 Seattle, WA 98101

Scott Bolden
Director Intellectual Property Section Commercial Litigation Branch
Civil Division U.S. Department of Justice

Scott.Bolden@usdoj.gov

DATED this 11th day of March, 2026.

Trevor Kevin Baylis *(Pro se)*
Jankannraiti 10 A 4
33560 Tampere FINLAND
+358 41 722 5899

**ADDENDUM**

# TABLE OF CONTENTS

**United States Code Title 17**

17 U.S.C. § 101 ........................................................3a

17 U.S.C. § 102 ........................................................9a

17 U.S.C. § 103 ........................................................10a

17 U.S.C. § 104 ........................................................11a

17 U.S.C. § 106 ........................................................12a

17 U.S.C. § 201 ........................................................13a

17 U.S.C. § 202 ........................................................14a

17 U.S.C. § 204 ........................................................14a

**Berne Convention for the Protection of Literary and Artistic Works (Paris Act, 1971)**

Article 3 ........................................................15a

Article 5 ........................................................16a

Article 6bis ........................................................17a

Article 15 ........................................................18a

**Guide To The Berne Convention for the Protection of Literary and Artistic Works (Paris Act, 1971)**

Article 3, paragraph (1) ........................................................19a

Article 5, paragraph (4) ........................................................19a

**§63(2) of Finnish copyright act** ........................................................23a

**German Act On Copyright And Related Rights**
      **(Urheberrechtsgesetz – UrhG translation by Ute Reusch)** ...................23a

**Television "The Tunnel"**
      **District Court of Munich ZUM-RO2001/2**............................................28a

**Copyright Law Of Germany Encyclopedia, Science**
**News & Research Reviews** ................................................................ 29a

**Berne Convention Implementation Act of 1988** ............................................. 30a

## UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1 - SUBJECT MATTER AND SCOPE OF COPYRIGHT

### 17 U.S.C. § 101 Definitions[1]

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

---

[1] Definitions and other provisions, treaties, statutes, and other regulations or rules are limited selections for relative to this particular case No. 25-7126 for practical reasons. Other statues and laws may apply.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made

simultaneously with its transmission.

An "international agreement" is—

      (1) the Universal Copyright Convention;

      (2) the Geneva Phonograms Convention;

      (3) the Berne Convention;

      (4) the WTO Agreement;

      (5) the WIPO Copyright Treaty;

      (6) the WIPO Performances and Phonograms Treaty; and

      (7) any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a

substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if—

(1) in the case of a published work, the work is first published—

(A) in the United States;

(B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical

arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities. In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, nor the deletion of the words added by that amendment—

(A) shall be considered or otherwise given any legal significance, or

(B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination, by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

## UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1 - Subject matter of copyright: In general

**17 U.S.C. § 102**

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise

communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

## UNITED STATES CODE
## TITLE 17. COPYRIGHTS
## CHAPTER 1 - Compilations and derivative works

**17 U.S.C. § 103**

(a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 1 - Subject matter of copyright: National origin**

**17 U.S.C. § 104**

(a) Unpublished Works.—

The works specified by sections 102 and 103, while unpublished, are subject

to protection under this title without regard to the nationality or domicile of the

author.

(b) Published Works.—The works specified by sections 102 and 103, when

published, are subject to protection under this title if—

(1) on the date of first publication, one or more of the authors is a national

or domiciliary of the United States, or is a national, domiciliary, or sovereign

authority of a treaty party, or is a stateless person, wherever that person may be

domiciled; or

(2) the work is first published in the United States or in a foreign nation that,

on the date of first publication, is a treaty party;

For purposes of paragraph (2), a work that is published in the United States

or a treaty party within 30 days after publication in a foreign nation that is not a

treaty party shall be considered to be first published in the United States or such

treaty party, as the case may be.

(c) Effect of Berne Convention.—

No right or interest in a work eligible for protection under this title may be

claimed by virtue of, or in reliance upon, the provisions of the Berne Convention,

or the adherence of the United States thereto. Any rights in a work eligible for

protection under this title that derive from this title, other Federal or State statutes,

or the common law, shall not be expanded or reduced by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 1 - Exclusive rights in copyrighted works**

**17 U.S.C. § 106**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 2 - COPYRIGHT OWNERSHIP AND TRANSFER**

**17 U.S.C. § 201**

Ownership Of Copyright

(a) Initial Ownership. —Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

(d) Transfer of Ownership.—

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

(e) Involuntary Transfer.—

When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 2 - Ownership of copyright as**
**distinct from ownership of material object**

**17 U.S.C. § 202**

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

**UNITED STATES CODE**
**TITLE 17. COPYRIGHTS**
**CHAPTER 2 - Execution of transfers of copyright ownership**

**17 U.S.C. § 204**

(a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

## BERNE CONVENTION FOR THE PROTECTION OF LITERARY AND ARTISTIC WORKS (PARIS ACT, 1971)

### Article 3

(1) The protection of this Convention shall apply to:

   (a) authors who are nationals of one of the countries of the Union, for their works, whether published or not;

   (b) authors who are not nationals of one of the countries of the Union, for their works first published in one of those countries, or simultaneously in a country outside the Union and in a country of the Union.

(2) Authors who are not nationals of one of the countries of the Union but who have their habitual residence in one of them shall, for the purposes of this Convention, be assimilated to nationals of that country.

(3) The expression "published works" means works published with the consent of their authors, whatever may be the means of manufacture of the copies, provided that the availability of such copies has been such as to satisfy the reasonable requirements of the public, having regard to the nature of the work. The performance of a dramatic, dramatico-musical, cinematographic or musical work, the public recitation of a literary work, the communication by wire or the broadcasting of literary or artistic works, the exhibition of a work of art and the construction of a work of architecture shall not constitute publication.

(4) A work shall be considered as having been published simultaneously in several countries if it has been published in two or more countries within thirty days of its first publication.

**Article 5**

(1) Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

(2) The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

(3) Protection in the country of origin is governed by domestic law. However, when the author is not a national of the country of origin of the work for which he is protected under this Convention, he shall enjoy in that country the same rights as national authors.

(4) The country of origin shall be considered to be

(a) in the case of works first published in a country of the Union, that country; in the case of works published simultaneously in several countries of the Union which grant different terms of protection, the country whose legislation grants the shortest term of protection;

(b) in the case of works published simultaneously in a country outside the Union and in a country of the Union, the latter country;

(c) in the case of unpublished works or of works first published in a country outside the Union, without simultaneous publication in a country of the Union, the

country of the Union of which the author is a national, provided that:

(i) when these are cinematographic works the maker of which has his headquarters or his habitual residence in a country of the Union, the country of origin shall be that country, and

(ii) when these are works of architecture erected in a country of the Union or other artistic works incorporated in a building or other structure located in a country of the Union, the country of origin shall be that country.

**Article 6bis**

(1) Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

(2) The rights granted to the author in accordance with the preceding paragraph shall, after his death, be maintained, at least until the expiry of the economic rights, and shall be exercisable by the persons or institutions authorized by the legislation of the country where protection is claimed. However, those countries whose legislation, at the moment of their ratification of or accession to this Act, does not provide for the protection after the death of the author of all the rights set out in the preceding paragraph may provide that some of these rights may, after his death, cease to be maintained.

(3) The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

**Article 15**

(1) In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in the countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner. This paragraph shall be applicable even if this name is a pseudonym, where the pseudonym adopted by the author leaves no doubt as to his identity.

(2) The person or body corporate whose name appears on a cinematographic work in the usual manner shall, in the absence of proof to the contrary, be presumed to be the maker of the said work.

(3) In the case of anonymous and pseudonymous works, other than those referred to in paragraph (1) above, the publisher whose name appears on the work shall, in the absence of proof to the contrary, be deemed to represent the author, and in this capacity be shall be entitled to protect and enforce the author's rights. The provisions of this paragraph shall cease to apply when the author reveals his identity and establishes his claim to authorship of the work.

(4)

   (a) In the case of unpublished works where the identity of the author is unknown, but where there is every ground to presume that he is a national of a country of the Union, it shall be a matter for legislation in that country to designate the competent authority who shall represent the author and shall be entitled to protect and enforce his rights in the countries of the Union.

   (b) Countries of the Union which make such designation under the terms of this provision shall notify the Director General by means of a written declaration giving

full information concerning the authority thus designated. The Director General shall at once communicate this declaration to all other countries of the Union.

### GUIDE TO THE BERNE CONVENTION FOR THE PROTECTION OF LITERARY AND ARTISTIC WORKS (PARIS ACT, 1971)

**Article 3, paragraph (1)**

3.2. This paragraph gives the benefit of protection to :

(a) authors who are nationals of a country of the Union for their works, published or unpublished: the point of attachment is the nationality of the author (personal criterion) :

(b) authors who are not nationals of a country of the Union but who publish their works for the first time in one of those countries or arrange that the publication of their works takes place simultaneously in a country outside the Union and in a Union country: the point of attachment is the place of first publication (geographical criterion).

3.3. In the first case, only the nationality of the author counts; in the second, one must consider where the work was published for the first time. (*Id* page 26).

**Article 5, paragraph (4)**

5.13. These extensions of the Convention's field of application have consequences as to the country of origin of works. This paragraph identifies three cases.

5.13.(a) works protected by the Convention by virtue of the geographical criterion (place of first publication) and published only within the Union: country of origin is the country of the Union where the work was first published. Place of publication (geographical criterion) prevails over the nationality or the habitual residence (personal criteria): a Belgian author or one habitually resident in Belgium

first publishes his work in the German Federal Republic; the country of origin is the latter country. The Convention also covers "simultaneous" publication i.e., within thirty days of the first. If the work is simultaneously published in several countries of the Union the country of origin is that whose legislation grants the shortest term of protection.

Note that the Convention assumes differing terms of protection in the two countries. It does not cover simultaneous publication in several countries each with the same term (the point is not academic since most countries have adopted the minimum laid down in Article 7). It seems that, here, courts must, if need be, decide, on the basis, for example, of the exact date of the various publications or perhaps the size of one edition as against the other. But the point may be only of academic importance in another sense. In the great majority of cases, the country of origin is only of importance to determine the term of protection, and, in the above hypothesis, all terms are the same.

5.13.(b) works protected by the Convention by virtue of the geographical criterion (place of first publication) and published simultaneously within and outside the Union: in this case the country of the Union prevails over the other to decide which is the country of origin of the work. (*Id* page 36).

5.13. These extensions of the Convention's field of application have consequences as to the country of origin of works. This paragraph identifies three cases.

5.13.(a) works protected by the Convention by virtue of the geographical criterion (place of first publication) and published only within the Union: country of origin is the country of the Union where the work was first published. Place of

publication (geographical criterion) prevails over the nationality or the habitual residence (personal criteria): a Belgian author or one habitually resident in Belgium first publishes his work in the German Federal Republic; the country of origin is the latter country. The Convention also covers "simultaneous" publication i.e., within thirty days of the first. If the work is simultaneously published in several countries of the Union the country of origin is that whose legislation grants the shortest term of protection.

Note that the Convention assumes differing terms of protection in the two countries. It does not cover simultaneous publication in several countries each with the same term (the point is not academic since most countries have adopted the minimum laid down in Article 7). It seems that, here, courts must, if need be, decide, on the basis, for example, of the exact date of the various publications or perhaps the size of one edition as against the other. But the point may be only of academic importance in another sense. In the great majority of cases, the country of origin is only of importance to determine the term of protection, and, in the above hypothesis, all terms are the same.

5.13.(b) works protected by the Convention by virtue of the geographical criterion (place of first publication) and published simultaneously within and outside the Union: in this case the country of the Union prevails over the other to decide which is the country of origin of the work.'

5.13. (c) works protected by the Convention by virtue of the personal criterion (nationality or habitual residence) which are unpublished or first published outside the Union: the Convention lays down that the country of origin is the country of the Union of which the author is a national. Note that this provision

only takes into consideration the nationality of the author and not the other aspect of the personal criterion, that of habitual residence.

Take the case of an author who, without being a national of a country of the Union, nevertheless habitually resides there. Should the same rule be applied here to decide the country of origin of his unpublished works as those first published in a country outside the Union without simultaneous publication within? It seems that the answer is yes, because this paragraph assimilates habitual residence to nationality for all purposes of the Convention, and one can therefore assume that the country of origin is that of his habitual residence when he is not a national of a Union country. Of course unpublished works of authors who are neither Union nationals nor residents remain outside the protection of the Convention altogether.

5.14. Paragraph (4)(c) lays down two exceptions to the normal rules applicable to unpublished works or those first published outside the Union.

5.14.(i) The first deals with cinematographic works and is the logical corollary to the new point of attachment introduced in the Stockholm Act (1967). The country of origin is determined by the headquarters or habitual residence of the maker; this general formula prevails over the other personal criterion, nationality or habitual residence of the author. The reason is that films by their nature are often works in which several authors collaborate ; the use of a personal criterion would produce confusion if these had different nationalities or residence, as is often the case.

Note, however, this only applies to unpublished works or those first published outside the Union. If the work is first, or simultaneously, published in a Union country the general rules of paragraphs (4)(a) and (b) apply. This exception merely recognises that films are often unpublished and, if the

country of origin were to depend on the nationality of the many coauthors, this would give rise to legal confusion whereas basing this on the maker (as in the points of attachment) makes for much more clarity. (*Id* page 37).

## §63(2) OF FINNISH COPYRIGHT ACT.

§63 Chapter 8. Applicability of the Act.

Territorial application (607/2015)

The provisions of this Act relating to copyright shall apply:

(2) to works first published in Finland or published in Finland within thirty days of having first been published in another country; 3) to a cinematographic work the producer of which has its headquarters or habitual residence in Finland;

### GERMAN ACT ON COPYRIGHT AND RELATED RIGHTS
#### *Urheberrechtsgesetz* – UrhG translation by Ute Reusch

Section 7

Author

The author is the creator of the work.

Section 8

Joint authors

(1) Where several persons have jointly created a work without it being possible to separately exploit their individual shares in the work, they are joint authors of the work.

(2) The right of publication and of exploitation of the work accrues jointly to the joint authors; alterations to the work are permitted only with the joint authors' consent. However, a joint author may not refuse consent to publication, exploitation or alteration contrary to the principles of good faith. Each joint author

is entitled to assert claims arising from violations of the joint copyright; a joint author may, however, demand performance only to all the joint authors.

(3) Proceeds derived from the use of the work are due to the joint authors in accordance with the extent of their involvement in the creation of the work, unless otherwise agreed between the joint authors.

(4) Joint authors may each waive their share of the exploitation rights (section 15). They must make a declaration of waiver to the other joint authors. Upon such declaration being made their share accrues to the other joint authors.

Section 9

Authors of compound works

Where several authors have combined their works for the purpose of joint exploitation, each may require the consent of the others to the publication, exploitation or alteration of the compound works if the consent of the others may be reasonably expected in good faith.

Section 10

Presumption of authorship or ownership

(1) The person designated as the author in the usual manner on the copies of a released work or on the original of an artistic work is regarded as the author of the work in the absence of proof to the contrary; the same applies to any designation which is known to be a pseudonym or stage name of the author.

Section 11

General

Copyright protects the author in his or her intellectual and personal relationships to the work and in respect of the use of the work. It also serves to ensure equitable remuneration for the use of the work.

Section 13

Recognition of authorship

The author has the right to be identified as the author of the work. The author may determine whether the work is to bear a designation of authorship and which designation is to be used.

Section 14

Distortion of work

The author has the right to prohibit the distortion or any other derogatory treatment of his or her work which is capable of prejudicing the author's legitimate intellectual or personal interests in the work.

Section 15

General

(1) The author has the exclusive right to exploit his or her work in material form; this right in particular includes

1. the right of reproduction (section 16),

2. the right of distribution (section 17),

3. the right of exhibition (section 18).

(2) Further, the author has the exclusive right to communicate his or her work to the public in non-material form (right of communication to the public). The right of

communication to the public in particular compromises

1. the right of recitation, performance and presentation (section 19),

2. the right of making the work available to the public (section 19a),

3. the right of broadcasting (section 20),

4. the right of communication by video or audio recordings (section 21),

5. the right of communication of broadcasts and of works made available to the public (section 22).

(3) The communication of a work is deemed public if it is intended for a plurality of members of the public. Anyone who is not connected by a personal relationship with the person exploiting the work or with the other persons to whom the work is made perceivable or made available in non-material form is deemed to be a member of the public.

Section 16

Right of reproduction

(1) 'Right of reproduction' means the right to produce copies of the work, whether on a temporary or on a permanent basis and regardless of by which means of procedure or in which quantity they are made.

(2) The transfer of the work to devices for the purposes of repeated communication of video and sound sequences (video and audio recordings), regardless of whether this is the recording of a communication of the work on a video or audio recording medium or the transfer of the work from one video or audio recording medium to another, also constitutes reproduction.

Section 17

Right of distribution

(1) 'Right of distribution' means the right to offer the original or copies of the work to the public or to put them into circulation.

Section 18

Right of exhibition

'Right of exhibition' means the right to display in public the original or the copies of an unpublished artistic work or an unpublished photographic work.

Section 19

Right of recitation, performance and presentation

(1) 'Right of recitation' means the right to give a public recital of a literary work by means of personal performance.

(2) 'Right of performance' means the right to give a public recital of a musical work by means of personal performance or to give a public theatrical performance of a work.

(3) The right of recitation and the right of performance include the right to make speeches and performances perceivable to the public by means of a screen, loud-speaker or similar technical devices outside of that room in which the personal performance is taking place.

(4) 'Right of presentation' means the right to make an artistic work, a photographic work, a cinematographic work or illustrations of a scientific or technical nature perceivable to the public by the use of technical devices. The right of presentation does not include the right to make the radio broadcast or the making available to the public of such works perceivable to the public (section 22).

Section 19a

Right of making works available to public

'Right of making works available to the public' means the right to make the work available to the public, either by wire or wireless means, in such a manner that members of the public may access it from a place and at a time individually chosen by them.

Section 20

Right of broadcasting

'Right of broadcasting' means the right to make a work available to the public by broadcasting, such as radio and television transmission, satellite transmission, cable transmission or by similar technical means.

### TELEVISION "THE TUNNEL"
### DISTRICT COURT OF MUNICH ZUM-RO2001/2

"The test is: would it be possible to exploit the contributions to the work independently of each other. If not, there is a work of joint authorship the copyright of which arises jointly in the co-authors, see Article8(1) of the German CopyrightAct. As a consequence, the ownership is held jointly by the co-owners. The joint property can only be transferred collectively."

"Thus unlike many other national copyright laws, according to German copyright law the authors of a script for a tv-film do not become joint authors of the tv-film- they are, just like the composer of the film music, authors of pre-existing works which are independent of the film work. Again, unlike U.S. law, German law does not know the work for hire doctrine according to which the initial ownership in the copyright of an audiovisual work may arise in the (legal)

person who employed the persons who created the work. The copyright arises always in the individual person(s) who created the work." (Arnold Vahrenwald Centrebar Munich. GERMANY • NEWS SECTION [2002] ENT.L.R http://vahrenwald.eu/wp-content/uploads/2017/01/117.DistCtMunich.19.01.01. TheTunnelJointAuthorshipAndTransferOfCopyright.2002.EntLR_.N2.pdf

PhD Arnold Vahrenwald is attorney at Law who deals specifically with energy law, film law, media law, copyright, patent law, advertising law, personal law, sports law, innovation, banking law, international private law, arbitration and out-of-court dispute resolution.

https://amradvisory.com/about-us/arnold-vahrenwald/

## COPYRIGHT LAW OF GERMANY ENCYCLOPEDIA, SCIENCE NEWS & RESEARCH REVIEWS

Transfer

Urhebergesetz is an author's right (droit d'auteur) or "monistic" style of law.

Therefore, special emphasis is placed on the relationship between the work and its actual author. This right is recognized as an aspect of the author's general moral rights and is therefore in principle non-transferable. This also means that there are no corporate copyrights in Germany and that fundamental rights cannot be transferred other than by inheritance ('legacy').

https://academic-accelerator.com/encyclopedia/copyright-law-of-germany

# BERNE CONVENTION IMPLEMENTATION ACT OF 1988

PUBLIC LAW 100–568—OCT. 31, 1988          102 STAT. 2853

Public Law 100–568
100th Congress

## An Act

To amend title 17, United States Code, to implement the Berne Convention for the Protection of Literary and Artistic Works, as revised at Paris on July 24, 1971, and for other purposes.

Oct. 31, 1988
[H.R. 4262]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE AND REFERENCES TO TITLE 17, UNITED STATES CODE.**

Berne
Convention
Implementation
Act of 1988.
Copyrights.
17 USC 101 note.

(a) SHORT TITLE.—This Act may be cited as the "Berne Convention Implementation Act of 1988".

(b) REFERENCES TO TITLE 17, UNITED STATES CODE.—Whenever in this Act an amendment or repeal is expressed in terms of an amendment to or a repeal of a section or other provision, the reference shall be considered to be made to a section or other provision of title 17, United States Code.

**SEC. 2. DECLARATIONS.**

17 USC 101 note.

The Congress makes the following declarations:

(1) The Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto (hereafter in this Act referred to as the "Berne Convention") are not self-executing under the Constitution and laws of the United States.

(2) The obligations of the United States under the Berne Convention may be performed only pursuant to appropriate domestic law.

(3) The amendments made by this Act, together with the law as it exists on the date of the enactment of this Act, satisfy the obligations of the United States in adhering to the Berne Convention and no further rights or interests shall be recognized or created for that purpose.

**SEC. 3. CONSTRUCTION OF THE BERNE CONVENTION.**

17 USC 101 note.

(a) RELATIONSHIP WITH DOMESTIC LAW.—The provisions of the Berne Convention—

(1) shall be given effect under title 17, as amended by this Act, and any other relevant provision of Federal or State law, including the common law; and

(2) shall not be enforceable in any action brought pursuant to the provisions of the Berne Convention itself.

(b) CERTAIN RIGHTS NOT AFFECTED.—The provisions of the Berne Convention, the adherence of the United States thereto, and satisfaction of United States obligations thereunder, do not expand or reduce any right of an author of a work, whether claimed under Federal, State, or the common law—

(1) to claim authorship of the work; or



(2) to object to any distortion, mutilation, or other modification of, or other derogatory action in relation to, the work, that would prejudice the author's honor or reputation.

**SEC. 4. SUBJECT MATTER AND SCOPE OF COPYRIGHTS.**

(a) SUBJECT AND SCOPE.—Chapter 1 is amended—

(1) in section 101—

(A) in the definition of "Pictorial, graphic, and sculptural works" by striking out in the first sentence "technical drawings, diagrams, and models" and inserting in lieu thereof "diagrams, models, and technical drawings, including architectural plans";

(B) by inserting after the definition of "Audiovisual works", the following:

"The 'Berne Convention' is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

"A work is a 'Berne Convention work' if—

"(1) in the case of an unpublished work, one or more of the authors is a national of a nation adhering to the Berne Convention, or in the case of a published work, one or more of the authors is a national of a nation adhering to the Berne Convention on the date of first publication;

"(2) the work was first published in a nation adhering to the Berne Convention, or was simultaneously first published in a nation adhering to the Berne Convention and in a foreign nation that does not adhere to the Berne Convention;

"(3) in the case of an audiovisual work—

"(A) if one or more of the authors is a legal entity, that author has its headquarters in a nation adhering to the Berne Convention; or

"(B) if one or more of the authors is an individual, that author is domiciled, or has his or her habitual residence in, a nation adhering to the Berne Convention; or

"(4) in the case of a pictorial, graphic, or sculptural work that is incorporated in a building or other structure, the building or structure is located in a nation adhering to the Berne Convention.

For purposes of paragraph (1), an author who is domiciled in or has his or her habitual residence in, a nation adhering to the Berne Convention is considered to be a national of that nation. For purposes of paragraph (2), a work is considered to have been simultaneously published in two or more nations if its dates of publication are within 30 days of one another."; and

(C) by inserting after the definition of "Copyright owner", the following:

"The 'country of origin' of a Berne Convention work, for purposes of section 411, is the United States if—

"(1) in the case of a published work, the work is first published—

"(A) in the United States;

"(B) simultaneously in the United States and another nation or nations adhering to the Berne Convention, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

PUBLIC LAW 100–568—OCT. 31, 1988     102 STAT. 2855

"(C) simultaneously in the United States and a foreign
nation that does not adhere to the Berne Convention; or
"(D) in a foreign nation that does not adhere to the Berne
Convention, and all of the authors of the work are nation-
als, domiciliaries, or habitual residents of, or in the case of
an audiovisual work legal entities with headquarters in the
United States;
"(2) in the case of an unpublished work, all the authors of the
work are nationals, domiciliaries, or habitual residents of the
United States, or, in the case of an unpublished audiovisual
work, all the authors are legal entities with headquarters in the
United States; or
"(3) in the case of a pictorial, graphic, or sculptural work
incorporated in a building or structure, the building or struc-
ture is located in the United States.
For the purposes of section 411, the 'country of origin' of any other
Berne Convention work is not the United States.'';
    (2) in section 104(b)—
            (A) by redesignating paragraph (4) as paragraph (5); and
            (B) by inserting after paragraph (3) the following new
        paragraph:
    "(4) the work is a Berne Convention work; or'';
    (3) in section 104 by adding at the end thereof the following:
"(c) EFFECT OF BERNE CONVENTION.—No right or interest in a
work eligible for protection under this title may be claimed by
virtue of, or in reliance upon, the provisions of the Berne Conven-
tion, or the adherence of the United States thereto. Any rights in a
work eligible for protection under this title that derive from this
title, other Federal or State statutes, or the common law, shall not
be expanded or reduced by virtue of, or in reliance upon, the
provisions of the Berne Convention, or the adherence of the United
States thereto.''; and
    (4) by inserting after section 116 the following new section:

**"§ 116A. Negotiated licenses for public performances by means of
coin-operated phonorecord players**

"(a) APPLICABILITY OF SECTION.—This section applies to any
nondramatic musical work embodied in a phonorecord.
"(b) LIMITATION ON EXCLUSIVE RIGHT IF LICENSES NOT NEGO-
TIATED.—
    "(1) APPLICABILITY.—In the case of a work to which this
section applies, the exclusive right under clause (4) of section
106 to perform the work publicly by means of a coin-operated
phonorecord player is limited by section 116 to the extent
provided in this section.
    "(2) DETERMINATION BY COPYRIGHT ROYALTY TRIBUNAL.—The
Copyright Royalty Tribunal, at the end of the 1-year period
beginning on the effective date of the Berne Convention Imple-
mentation Act of 1988, and periodically thereafter to the
extent necessary to carry out subsection (f), shall determine
whether or not negotiated licenses authorized by subsection (c)
are in effect so as to provide permission to use a quantity of
musical works not substantially smaller than the quantity of
such works performed on coin-operated phonorecord players
during the 1-year period ending on the effective date of that
Act. If the Copyright Royalty Tribunal determines that such
negotiated licenses are not so in effect, the Tribunal shall, upon     Federal
Register,
publication.

Page 32a

making the determination, publish the determination in the Federal Register. Upon such publication, section 116 shall apply with respect to musical works that are not the subject of such negotiated licenses.

"(c) NEGOTIATED LICENSES.—

"(1) AUTHORITY FOR NEGOTIATIONS.—Any owners of copyright in works to which this section applies and any operators of coin-operated phonorecord players may negotiate and agree upon the terms and rates of royalty payments for the performance of such works and the proportionate division of fees paid among copyright owners, and may designate common agents to negotiate, agree to, pay, or receive such royalty payments.

"(2) ARBITRATION.—Parties to such a negotiation, within such time as may be specified by the Copyright Royalty Tribunal by regulation, may determine the result of the negotiation by arbitration. Such arbitration shall be governed by the provisions of title 9, to the extent such title is not inconsistent with this section. The parties shall give notice to the Copyright Royalty Tribunal of any determination reached by arbitration and any such determination shall, as between the parties to the arbitration, be dispositive of the issues to which it relates.

"(d) LICENSE AGREEMENTS SUPERIOR TO COPYRIGHT ROYALTY TRIBUNAL DETERMINATIONS.—License agreements between one or more copyright owners and one or more operators of coin-operated phonorecord players, which are negotiated in accordance with subsection (c), shall be given effect in lieu of any otherwise applicable determination by the Copyright Royalty Tribunal.

"(e) NEGOTIATION SCHEDULE.—Not later than 60 days after the effective date of the Berne Convention Implementation Act of 1988, if the Chairman of the Copyright Royalty Tribunal has not received notice, from copyright owners and operators of coin-operated phonorecord players referred to in subsection (c)(1), of the date and location of the first meeting between such copyright owners and such operators to commence negotiations authorized by subsection (c), the Chairman shall announce the date and location of such meeting. Such meeting may not be held more than 90 days after the effective date of such Act.

"(f) COPYRIGHT ROYALTY TRIBUNAL TO SUSPEND VARIOUS ACTIVITIES.—The Copyright Royalty Tribunal shall not conduct any rate-making activity with respect to coin-operated phonorecord players unless, at any time more than one year after the effective date of the Berne Convention Implementation Act of 1988, the negotiated licenses adopted by the parties under this section do not provide permission to use a quantity of musical works not substantially smaller than the quantity of such works performed on coin-operated phonorecord players during the one-year period ending on the effective date of such Act.

"(g) TRANSITION PROVISIONS; RETENTION OF COPYRIGHT ROYALTY TRIBUNAL JURISDICTION.—Until such time as licensing provisions are determined by the parties under this section, the terms of the compulsory license under section 116, with respect to the public performance of nondramatic musical works by means of coin-operated phonorecord players, which is in effect on the day before the effective date of the Berne Convention Implementation Act of 1988, shall remain in force. If a negotiated license authorized by this section comes into force so as to supersede previous determinations of the Copyright Royalty Tribunal, as provided in subsection (d), but

PUBLIC LAW 100–568—OCT. 31, 1988     102 STAT. 2857

thereafter is terminated or expires and is not replaced by another licensing agreement, then section 116 shall be effective with respect to musical works that were the subject of such terminated or expired licenses.".

(b) TECHNICAL AMENDMENTS.—(1) Section 116 is amended—

(A) by amending the section heading to read as follows:

"**§ 116. Scope of exclusive rights in nondramatic musical works: Compulsory licenses for public performances by means of coin-operated phonorecord players**";

(B) in subsection (a) in the matter preceding paragraph (1), by inserting after "in a phonorecord," the following: "the performance of which is subject to this section as provided in section 116A,"; and

(C) in subsection (e), by inserting "and section 116A" after "As used in this section".

(2) The table of sections at the beginning of chapter 1 is amended by striking out the item relating to section 116, and inserting in lieu thereof the following:

"116. Scope of exclusive rights in nondramatic musical works: Compulsory licenses for public performances by means of coin-operated phonorecord players.

"116A. Negotiated licenses for public performances by means of coin-operated phonorecord players.".

**SEC. 5. RECORDATION.**

Section 205 is amended—

(1) by striking out subsection (d); and

(2) by redesignating subsections (e) and (f) as subsections (d) and (e), respectively.

**SEC. 6. PREEMPTION WITH RESPECT TO OTHER LAWS NOT AFFECTED.**

Section 301 is amended by adding at the end thereof the following:

"(e) The scope of Federal preemption under this section is not affected by the adherence of the United States to the Berne Convention or the satisfaction of obligations of the United States thereunder.".

**SEC. 7. NOTICE OF COPYRIGHT.**

(a) VISUALLY PERCEPTIBLE COPIES.—Section 401 is amended—

(1) in subsection (a), by amending the subsection heading to read as follows:

"(a) GENERAL PROVISIONS.—";

(2) in subsection (a), by striking out "shall be placed on all" and inserting in lieu thereof "may be placed on";

(3) in subsection (b), by striking out "The notice appearing on the copies" and inserting in lieu thereof "If a notice appears on the copies, it"; and

(4) by adding at the end the following:

"(d) EVIDENTIARY WEIGHT OF NOTICE.—If a notice of copyright in the form and position specified by this section appears on the published copy or copies to which a defendant in a copyright infringement suit had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages, except as provided in the last sentence of section 504(c)(2).".

(b) PHONORECORDS OF SOUND RECORDINGS.—Section 402 is amended—

(1) in subsection (a), by amending the subsection heading to read as follows:

"(a) GENERAL PROVISIONS.—";

(2) in subsection (a), by striking out "shall be placed on all" and inserting in lieu thereof "may be placed on";

(3) in subsection (b), by striking out "The notice appearing on the phonorecords" and inserting in lieu thereof "If a notice appears on the phonorecords, it"; and

(4) by adding at the end thereof the following new subsection:

"(d) EVIDENTIARY WEIGHT OF NOTICE.—If a notice of copyright in the form and position specified by this section appears on the published phonorecord or phonorecords to which a defendant in a copyright infringement suit had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages, except as provided in the last sentence of section 504(c)(2).".

(c) PUBLICATIONS INCORPORATING UNITED STATES GOVERNMENT WORKS.—Section 403 is amended to read as follows:

"Sections 401(d) and 402(d) shall not apply to a work published in copies or phonorecords consisting predominantly of one or more works of the United States Government unless the notice of copyright appearing on the published copies or phonorecords to which a defendant in the copyright infringement suit had access includes a statement identifying, either affirmatively or negatively, those portions of the copies or phonorecords embodying any work or works protected under this title.".

(d) NOTICE OF COPYRIGHT; CONTRIBUTIONS TO COLLECTIVE WORKS.— Section 404 is amended—

(1) in subsection (a), by striking out "to satisfy the requirements of sections 401 through 403", and inserting in lieu thereof "to invoke the provisions of section 401(d) or 402(d), as applicable"; and

(2) in subsection (b), by striking out "Where" and inserting in lieu thereof "With respect to copies and phonorecords publicly distributed by authority of the copyright owner before the effective date of the Berne Convention Implementation Act of 1988, where".

(e) OMISSION OF NOTICE.—Section 405 is amended—

(1) in subsection (a), by striking out "The omission of the copyright notice prescribed by" and inserting in lieu thereof "With respect to copies and phonorecords publicly distributed by authority of the copyright owner before the effective date of the Berne Convention Implementation Act of 1988, the omission of the copyright notice described in";

(2) in subsection (b), by striking out "omitted," in the first sentence and inserting in lieu thereof "omitted and which was publicly distributed by authority of the copyright owner before the effective date of the Berne Convention Implementation Act of 1988,"; and

(3) by amending the section heading to read as follows:

**"§ 405. Notice of copyright: Omission of notice on certain copies and phonorecords"**

(f) ERROR IN NAME OR DATE.—Section 406 is amended—

(1) in subsection (a) by striking out "Where" and inserting in lieu thereof "With respect to copies and phonorecords publicly distributed by authority of the copyright owner before the

PUBLIC LAW 100–568—OCT. 31, 1988        102 STAT. 2859

effective date of the Berne Convention Implementation Act of 1988, where'';
(2) in subsection (b) by inserting ''before the effective date of the Berne Convention Implementation Act of 1988'' after ''distributed'';
(3) in subsection (c)—
(A) by inserting ''before the effective date of the Berne Convention Implementation Act of 1988'' after ''publicly distributed''; and
(B) by inserting after ''405'' the following: ''as in effect on the day before the effective date of the Berne Convention Implementation Act of 1988''; and
(4) by amending the section heading to read as follows:

**''§ 406. Notice of copyright: Error in name or date on certain copies and phonorecords''.**

(g) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 4 is amended by striking out the items relating to sections 405 and 406 and inserting in lieu thereof the following:

''405. Notice of copyright: Omission of notice on certain copies and phonorecords.
''406. Notice of copyright: Error in name or date on certain copies and phonorecords.''.

**SEC. 8. DEPOSIT OF COPIES OR PHONORECORDS FOR LIBRARY OF CONGRESS.**

Section 407(a) is amended by striking out ''with notice of copyright''.

**SEC. 9. COPYRIGHT REGISTRATION.**

(a) REGISTRATION IN GENERAL.—Section 408 is amended—
(1) in subsection (a), by striking out ''Subject to the provisions of section 405(a), such'' in the second sentence and inserting in lieu thereof ''Such'';
(2) in subsection (c)(2)—
(A) by striking out ''all of the following conditions—'' and inserting in lieu thereof ''the following conditions:'';
(B) by striking out subparagraph (A); and
(C) by redesignating subparagraphs (B) and (C) as subparagraphs (A) and (B), respectively.
(b) INFRINGEMENT ACTIONS.—
(1) REGISTRATION AS A PREREQUISITE.—Section 411 is amended—
(A) by amending the section heading to read as follows:

**''§ 411. Registration and infringement actions'';**

(B) in subsection (a) by striking out ''Subject'' and inserting in lieu thereof ''Except for actions for infringement of copyright in Berne Convention works whose country of origin is not the United States, and subject''; and
(C) in subsection (b)(2) by inserting '', if required by subsection (a),'' after ''work''.
(2) TABLE OF SECTIONS.—The table of sections at the beginning of chapter 4 is amended by striking out the item relating to section 411 and inserting in lieu thereof the following:

''411. Registration and infringement actions.''.

102 STAT. 2860      PUBLIC LAW 100–568—OCT. 31, 1988

**SEC. 10. COPYRIGHT INFRINGEMENT AND REMEDIES.**

(a) INFRINGEMENT.—Section 501(b) is amended by striking out "sections 205(d) and 411," and inserting in lieu thereof "section 411,".

(b) DAMAGES AND PROFITS.—Section 504(c) is amended—

(1) in paragraph (1)—

(A) by striking out "$250", and inserting in lieu thereof "$500"; and

(B) by striking out "$10,000", and inserting in lieu thereof "$20,000"; and

(2) in paragraph (2)—

(A) by striking out "$50,000.", and inserting in lieu thereof "$100,000."; and

(B) by striking out "$100.", and inserting in lieu thereof "$200.".

**SEC. 11. COPYRIGHT ROYALTY TRIBUNAL.**

Chapter 8 is amended—

(1) in section 801, by adding at the end of subsection (b) the following: "In determining whether a return to a copyright owner under section 116 is fair, appropriate weight shall be given to—

"(i) the rates previously determined by the Tribunal to provide a fair return to the copyright owner, and

"(ii) the rates contained in any license negotiated pursuant to section 116A of this title."; and

(2) by amending section 804(a)(2)(C) to read as follows:

"(C)(i) In proceedings under section 801(b)(1) concerning the adjustment of royalty rates as provided in section 115, such petition may be filed in 1990 and in each subsequent tenth calendar year, and at any time within 1 year after negotiated licenses authorized by section 116A are terminated or expire and are not replaced by subsequent agreements.

"(ii) If negotiated licenses authorized by section 116A come into force so as to supersede previous determinations of the Tribunal, as provided in section 116A(d), but thereafter are terminated or expire and are not replaced by subsequent agreements, the Tribunal shall, upon petition of any party to such terminated or expired negotiated license agreement, promptly establish an interim royalty rate or rates for the public performance by means of a coin-operated phonorecord player of nondramatic musical works embodied in phonorecords which had been subject to the terminated or expired negotiated license agreement. Such interim royalty rate or rates shall be the same as the last such rate or rates and shall remain in force until the conclusion of proceedings to adjust the royalty rates applicable to such works, or until superseded by a new negotiated license agreement, as provided in section 116A(d).".

17 USC 101 note.      **SEC. 12. WORKS IN THE PUBLIC DOMAIN.**

Title 17, United States Code, as amended by this Act, does not provide copyright protection for any work that is in the public domain in the United States.

PUBLIC LAW 100–568—OCT. 31, 1988          102 STAT. 2861

**SEC. 13. EFFECTIVE DATE; EFFECT ON PENDING CASES.**                    17 USC 101 note.

(a) EFFECTIVE DATE.—This Act and the amendments made by this Act take effect on the date on which the Berne Convention (as defined in section 101 of title 17, United States Code) enters into force with respect to the United States.

(b) EFFECT ON PENDING CASES.—Any cause of action arising under title 17, United States Code, before the effective date of this Act shall be governed by the provisions of such title as in effect when the cause of action arose.

Approved October 31, 1988.

---

LEGISLATIVE HISTORY—H.R. 4262 (S. 1301):

HOUSE REPORTS: No. 100–609 (Comm. on the Judiciary).
SENATE REPORTS: No. 100–352 accompanying S. 1301 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 134 (1988):
    May 10, considered and passed House.
    Oct. 5, S. 1301 considered and passed Senate; proceedings vacated and H.R.
      4262, amended, passed in lieu.
    Oct. 12, House concurred in Senate amendment.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 24 (1988):
    Oct. 31, Presidential remarks.